UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL GOLDEMBERG, ANNIE LE, and HOWARD PETLACK, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JOHNSON & JOHNSON CONSUMER COMPANIES, INC.,<br><br>Defendant. | No. 7:13-cv-03073-NSR-LMS |

**REPLY DECLARATION OF KEITH R. UGONE, PH.D.**

**January 19, 2016**

REFERS TO HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER

# REPLY DECLARATION OF KEITH R. UGONE, PH.D.

## January 19, 2016

I.    OVERVIEW OF ASSIGNMENT .................................................................. 1

II.    SUMMARY OF OPINIONS ...................................................................... 2

III.    RESPONSES TO DR. DUBÉ'S EVALUATION OF THE UGONE DECLARATION .............................................................................. 4

    A.  Dr. Dubé's Comments Regarding My Ability To Rebut The Dubé Report Are Ill-Informed .............................................................................. 5

    B.  An Appropriate Damages Methodology Must Account For The Variety Of Interpretations Of The Challenged Claim ................................................ 8

    C.  Willingness-To-Pay Is Not The Appropriate Measure Of Damages ......................... 10

    D.  Dr. Dubé Does Not Alleviate Concerns Regarding The Workability Of His Proposed Methodology ...................................................................... 14

    E.  Dr. Dubé's Proposed Treatment Of The Challenged Claim Variable In His Model Fails To Address Important Issues .......................................................... 19

    F.  There Likely Is Substantial Price Variation In The Market For Challenged Products ................................................................................... 21

    G.  Preferences For Natural Products May Have Evolved Over Class Period ................. 22

REFERS TO HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER

# REPLY DECLARATION OF KEITH R. UGONE, PH.D.

## January 19, 2016

I, Keith R. Ugone, hereby declare:

1.      I am an economist and have been retained by counsel for Johnson & Johnson Consumer Companies, Inc. ("J&JCC" or the "Defendant") to offer my opinions regarding various economic and associated class certification issues relevant to the matter of *Michael Goldemberg et al. vs. Johnson & Johnson Consumer Companies, Inc.* I prepared this declaration in support of J&JCC's Reply to Plaintiffs' Opposition to Defendant's Motion to Exclude the Expert Report of J.P. Dubé dated December 18, 2015. Except as otherwise indicated, I have personal knowledge of the following facts and, if called to testify, could and would competently testify to the facts set forth below.

## I.      OVERVIEW OF ASSIGNMENT

2.      On September 17, 2015, Dr. Jean-Pierre Dubé ("Dr. Dubé") submitted a report ("Dubé Report") proposing a methodology for evaluating Class-wide damages in this matter. I submitted a rebuttal declaration on November 13, 2015 (the "Ugone Declaration"). In the Ugone Declaration, I evaluated from an economic perspective the random coefficients demand estimation ("RCDE") and conjoint analysis approaches presented by Dr. Dubé. Dr. Dubé proposed these approaches for measuring putative Class members' willingness-to-pay ("WTP") for the Challenged Claim.[1] Given the facts and circumstances of this case, my opinion was that the approaches proposed by Dr. Dubé lacked sufficient detail to give the Court assurances they could be executed, and even in the event they could be

---

[1] Declaration of Keith R. Ugone, Ph.D., dated November 13, 2015 ("Ugone Declaration"), p. 3. I also addressed whether standard economic analysis could be used to quantify claimed damages on a Class-wide basis using common proof. (Ugone Declaration, p. 3.) I concluded that any claimed injury and/or claimed damages suffered by the putative Class members as a result of the Challenged Claim is not amenable to evaluation and quantification using Class-wide (or common) proof. (Ugone Declaration, p. 4.)

REFERS TO HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER

executed, they would not provide a reliable or relevant measure of the economic injury (if any) suffered by putative Class members.[2]

3.      On December 18, 2015, Dr. Dubé submitted a reply declaration in this matter (the "Dubé Reply Declaration"). In the Dubé Reply Declaration, Dr. Dubé reviewed and responded to the Ugone Declaration.[3] I have been requested by counsel for J&JCC to respond to Dr. Dubé's evaluation of the Ugone Declaration.

## II.      <u>SUMMARY OF OPINIONS</u>

4.      Based upon (a) my review of the Dubé Report and the Dubé Reply Declaration, (b) my economics and damages quantification training and experience, (c) documentary evidence, (d) deposition testimony (i.e., the Dubé Deposition, among others), and (e) the detailed analyses presented in the Ugone Declaration, I have reached the following conclusions regarding claimed damages in this matter and Dr. Dubé's proposed RCDE and conjoint analysis approaches for determining consumers' WTP for the Challenged Active Naturals claim.

a.      <u>Dr. Dubé's Comments Regarding My Ability To Rebut The Dubé Report Are Ill-Informed</u>. Dr. Dubé is critical of my suggested approach (and ability to evaluate his work) without acknowledging that numerous courts have accepted my analyses. I have issued reports in 36 class action matters and provided deposition testimony in 18 class action matters. In 12 matters where I was a damages expert, class certification was denied. The Courts expressly relied upon my opinions to decide class certification motions in many of these cases. Dr. Dubé's assertions that I am not qualified to opine to the potential issues in the Dubé Report are ill-informed. I have decades of experience providing economic consulting services, evaluating demand and supply conditions, evaluating regression analyses, and analyzing consumer product markets as a basis for my evaluation of the Dubé Report. (**Section III.A.**)

---

[2] Ugone Declaration, p. 4. Alternatively stated, my opinion was that Dr. Dubé has not provided a workable model for evaluating or calculating claimed damages and/or economic harm suffered by the putative Class members, where economic harm or economic injury is measured by the price paid by a consumer for the Challenged Product(s) versus the value received by that consumer.

[3] Reply Declaration of Jean-Pierre Dubé dated December 15, 2015 ("Dubé Reply Declaration"), p. 2.

    b. <u>An Appropriate Damages Methodology Must Account For The Variety Of Interpretations Of The Challenged Claim</u>. Dr. Dubé is incorrect that individual inquiry into the interpretation of the Challenged Claim is not required. Consumers who interpreted the Challenged Claim as intended (i.e., that the products contain specific natural ingredients) and thus were not misled may still place a premium on the products based on the Challenged Claim. Even if Dr. Dubé identified a value associated with the Active Naturals claim as he proposes, that value could be driven in whole or in part by non-misleading interpretations of that claim. (**Section III.B.**)

    c. <u>Willingness-To-Pay Is Not The Appropriate Measure Of Damages</u>. While Dr. Dubé states he could calculate a price premium, this is not the primary calculation Dr. Dubé says he would present as his measure of claimed damages (as articulated in his initial report, in his deposition, and reiterated in his reply declaration).[4] Dr. Dubé plans to present a WTP damages figure. (**Section III.C.**)

    d. <u>Dr. Dubé Does Not Alleviate Concerns Regarding The Workability Of His Proposed Methodology</u>. With respect to the concerns raised in the Ugone Declaration regarding the lack of details or any initial analyses, Dr. Dubé responded with assurances such details could be addressed (without providing any additional information, investigation, or analyses). The concerns Dr. Dubé failed to address include the following (among other things):

        i. whether his proposed model will actually present a positive willingness-to-pay when executed in practice;

        ii. how he will categorize (or group) the 90 Challenged Products;

        iii. what product characteristics he will include in his analyses;

        iv. what competitor products he will include in his analyses;

        v. how he will select the competitor products;

        vi. how he will obtain reliable historical labeling information to identify when a particular label and product formulation was available for sale in each market; and

        vii. how he will define his "market" (i.e., what products will be included in each estimation and what the geographic boundaries of each market will be). (**Section III.D.**)

    e. <u>Dr. Dubé's Proposed Treatment Of The Challenged Claim Variable In His Model Fails To Address Important Issues</u>. Dr. Dubé states that he plans to use a "yes" or "no" variable as to the presence of the Challenged Claim and will not differentiate between the location or presence of additional information defining and clarifying the meaning

_____

[4] I would note that the criticisms detailed in the Ugone Declaration with respect to Dr. Dubé's willingness-to-pay calculation are not alleviated by simply using the price premium described by Dr. Dubé as an alternative.

REFERS TO HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER

_____

of Active Naturals. Dr. Dubé's intended limited categorization of the Challenged Claim is insufficient to properly capture information contained on the Aveeno labels described in detail in the Ugone Declaration. This limited treatment shows that Dr. Dubé fails to recognize (and will not analyze) that (i) different presentations of information may have different values to consumers (and thus should be treated differently) and (ii) different presentations may impact the likelihood (if any exists) that consumers hold the alleged misleading interpretation of the Challenged Claim (as opposed to a correct interpretation that may lead to value differences). (**Section III.E.**)

    f.   There Likely Is Substantial Price Variation In The Market For Challenged Products. Dr. Dubé asserts without <u>any</u> analysis that there is not significant price variation to be of concern (without even describing what variation would be troublesome). Dr. Dubé provides an assertion that there is no evidence of extensive price variability (and thus implying from his perspective that absent such evidence it must not exist). Given the different geographic areas where sales take place, the six-year time period over which sales take place, and the variety of distribution channels over which sales take place, there is a high likelihood of significant price variability. (**Section III.F.**)

    g.   Preferences For Natural Products May Have Evolved Over Class Period. To the extent that Dr. Dubé plans to use current survey data and apply such survey data to draw inferences as to consumers' tastes and preferences six years earlier, it is appropriate for Dr. Dubé to affirmatively demonstrate that consumers' tastes and preferences have not changed (rather than assuming this issue is non-existent). Contrary to Dr. Dubé's assertion, there is substantial evidence that would be consistent with consumers' preference for "natural" products changing over time.[5] (**Section III.G.**)

5.    The details of my responses to the Dubé Reply Declaration are contained in the remainder of this declaration.

## III.    <u>RESPONSES TO DR. DUBÉ'S EVALUATION OF THE UGONE DECLARATION</u>

6.    In the Dubé Reply Declaration, Dr. Dubé made a variety of claims that generally can be placed into one of seven categories: (a) claims regarding the general acceptability of my opinions and qualifications to rebut the Dubé Report; (b) arguments against individual inquiry into interpretations of the Challenged Claim raised in the Ugone Declaration; (c) claims that willingness-to-pay is the appropriate measure of Class-wide damages; (d)

_____

[5] I present examples of such evidence in **Section III.G.** below.

claims that his model is workable and that appropriate data exists and will be obtained for use in this matter; (e) his proposed categorization of the Challenged Claim as a "yes" or "no" variable without regard to additional information contained on the Challenged Products' labels; (f) claims that there is little price variation relating to the Challenged Products; and (g) claims that preferences for natural products have not evolved over time.

7.    Dr. Dubé's assertions as presented in the Dubé Reply Declaration generally do not address the issues and observations raised in the Ugone Declaration.  The Dubé Reply Declaration fails to support Dr. Dubé's assertion that the proposed RCDE and conjoint analysis approaches will be workable in practice in this matter.  The Dubé Reply Declaration also fails to support Dr. Dubé's assertion that his proposed WTP value(s) will provide a reliable measure of claimed damages on a Class-wide basis using common proof in this matter.

### A.    Dr. Dubé's Comments Regarding My Ability To Rebut The Dubé Report Are Ill-Informed

8.    Dr. Dubé makes numerous ill-informed claims relating to the lack of validity of the opinions expressed in the Ugone Declaration.  Dr. Dubé's claims are flawed and are inconsistent with the numerous courts which have accepted the opinions I put forward and used in other matters (in conjunction with facts particular to those matters).  I address each of Dr. Dubé's claims below.

a.    **Dr. Dubé's Claim**.  Dr. Dubé asserts that "Dr. Ugone provides no supporting evidence that his 'Economic Analysis' is a well-accepted approach by Economists."[6]

**Response**.

i.    Dr. Dubé has no basis for this assertion.  Contrary to Dr. Dubé's deposition testimony about his own approach, I explicitly described in my rebuttal declaration

---

[6] Dubé Reply Declaration, p. 6.

_____

exactly the methodology I used to analyze whether Class-wide damages could be evaluated using common proof. I reiterated this approach in my deposition.[7] There are no uncertainties as to my approach or how I would conduct my evaluation. In contrast, there are significant uncertainties as to how Dr. Dubé is going to conduct his analysis. One example deals with data acquisition.

- There is no concrete discussion (or examples) in Dr. Dubé's reports as to whether actual data exists to conduct the analyses proposed by Dr. Dubé.

- I provide significant data in the Ugone Declaration relating to many of the considerations that would be important to an analysis of Class wide damages using common proof.

ii. Dr. Dubé questions whether my approach is well-accepted by economists. Dr. Dubé states "Dr. Ugone labels his template 'Economic Analysis' even though no economic theory, economic modeling or econometric (i.e. statistical) analysis is mentioned as part of the approach."[8]

- Contrary to Dr. Dubé's assertions, my analysis is comprised entirely of economic concepts and I employ economic theory and economic reasoning.

- According to Dr. Dubé:[9]

    Section II.A of the Ugone Declaration enumerates a long list of consumer-specific factors -- many intangible, psychological (i.e. non-economic) and/or empirically unmeasurable -- that he deems relevant to an evaluation of the incidence and magnitude of Class-wide damages. This list of factors consists of: (a) Reasons for purchase; (b) Knowledge and perceptions related to the claim; (c) Specific prices paid by individual Class members; (d) Asserted response of Class members (i.e. their "counter-factual choices if the claim were removed from the packaging"); (e) Lack of evidence for specific individual Class members.

    Ironically, it is Dr. Dubé's assertions that do not make economic sense. Reasons for purchase (including tastes & preferences for product attributes); knowledge relating to the claim (i.e., the information available to the customer at time of purchase); the prices paid; what the consumer would have done in the absence of the alleged mislabeling; and the quantities purchased by putative Class members are (a) all economic inputs (and demand–side considerations) and (b) important economic considerations as to whether Class-wide damages

_____

[7] Ugone Deposition, pp. 17 – 21.

[8] Dubé Reply Declaration, p. 6.

[9] Dubé Reply Declaration, pp. 6 – 7.

REFERS TO HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER

_____

can be evaluated using common proof.  It is untenable for Dr. Dubé to claim the aforementioned considerations are not economic concepts.

iii. To paraphrase Dr. Dubé's argument, there are two evaluations that have been proposed for consideration by the Court (i.e., Dr. Dubé's and mine).  While Dr. Dubé disagrees with my analysis and conclusions, he cannot support an argument that it is not a "well-accepted approach."  In particular, Dr. Dubé is critical of my suggested approach without acknowledging that numerous courts have accepted my analysis.  In particular, I have issued reports in 36 class action matters and provided deposition testimony in 18 class action matters.  In 12 matters where I was an expert, class certification was denied, and the Court expressly relied upon my opinions to decide class certification motions in many of these cases.[10]

b. **Dr. Dubé's Claim**.  Dr. Dubé claims that "Dr. Ugone's lack of familiarity and experience with demand estimation and RCDE in particular likely limit his ability to judge the feasibility of my proposed approach" and that "it is unlikely that Dr. Ugone…would be qualified to evaluate the methodology."[11]

**Response**.  Dr. Dubé's assertions that I am not qualified to opine to the potential issues in the Dubé Report simply is incorrect.  I have decades of experience providing economic consulting services, evaluating demand and supply conditions, evaluating regression analyses, analyzing pricing trends, and analyzing consumer product markets.  I also bring a unique perspective because I have evaluated such issues across a wide array of contexts (including antitrust cases, class certification matters, and intellectual property matters, among others).[12]

In fact, what should not be lost, is that many of the observations and criticisms levied by Dr. Dubé relate to a disagreement over (a) the availability of data (and the need to demonstrate such availability to provide assurances to the Court that Dr. Dubé's proposed model is workable in practice), (b) the appropriateness of willingness-to-pay (or "compensating variation") as the basis for damages in this matter, and (c) whether simply outlining a textbook model without accompanying details provides suitable assurances to the Court that such a model can overcome issues with estimating the model in practice – given the facts and circumstances of this matter.  In light of my

_____

[10] These 12 matters are (1) *Evan Weiner and Timothy McClausland v. Snapple Beverage Corporation;* (2) *Batsheva Ackerman et al. v. Coco-Cola Company and Energy Brands, Inc.;* (3) *Yanira Algarin v. Maybelline, LLC dba Maybelliine New York;* (4) *Levi Jones et al. v. ConAgra Foods, Inc.;* (5) *Vanessa Lombardo v. Johnson & Johnson Consumers Companies, Inc. and Neutrogena Corporation;* (6) *The Board of Trustees of the Southern California IBEW-NECA Defined Contribution Plan et al. v. The Bank of New York Mellon Corporation et al.;* (7) *In Re: Dial Complete Marketing and Sales Practices Litigation;* (8) *Chris Werdebaugh v. Blue Diamond Growers* (class was decertified in this matter); (9) *Amy Langendorf v. Skinnygirl Cocktails, LLC, et al.;* (10) *Maureen Stewart et al. v. Skinnygirl Cocktails, LLC, et al.;* (11) *Mara Chow v. Neutrogena Corp.;* and (12) *Haley et al. v. Kolbe & Kolbe Millwork Co., Inc.*

[11] Dubé Reply Declaration, p. 24.

[12] *See* my resume attached as Exhibit 1 to the Ugone Declaration.

extensive experience, I am well qualified to highlight these difficulties and issues for the Court's consideration.

    c.  **Dr. Dubé's Claim**.  Dr. Dubé asserts that I am unqualified to provide a reliable opinion about the feasibility or the relevant details regarding a conjoint analysis.[13]

        **Response**.  Dr. Dubé's criticism is misplaced.  I do not contend I am an expert in performing conjoint analyses and have not conducted such an analysis by myself (or assert that I would conduct such an analysis independently).  However, Dr. Dubé is simply incorrect relating to my ability to analyze a conjoint analysis <u>from an economic perspective</u> – a point upon which I clearly testified.  I have extensive experience analyzing proposed conjoint analyses from an economic perspective.  In addition, Dr. Dubé's protestations aside, the observations I presented concerning the shortcomings of Dr. Dubé's application of conjoint analysis still apply (as well as my observations concerning the aspects of Dr. Dubé's proposed conjoint analysis that Dr. Dubé did not specify).

### B.  An Appropriate Damages Methodology Must Account For The Variety Of Interpretations Of The Challenged Claim

9.     Dr. Dubé asserts that individual inquiry regarding various interpretations of the Challenged Claim is unnecessary as J&JCC does not vary packaging based upon a consumer's interpretation of the claims.[14]  According to Dr. Dubé, were J&JCC to remove the Challenged Claim, all consumers would be exposed to that same removal and same change in prices.[15]

10.    Dr. Dubé's arguments on this point are misplaced.  Dr. Dubé is incorrect that individual inquiry into the interpretation of the Challenged Claim is not required.  As I noted in my original declaration, based upon the particular facts of this matter, there are numerous

---

[13] Dubé Reply Declaration, p. 30.

[14] Dubé Reply Declaration, p. 7.

[15] Dubé Reply Declaration, pp. 8 and 18.  In many respects, Dr. Dubé's arguments are internally inconsistent.  The change in prices from a removal of the Challenged Claim to which Dr. Dubé alludes also could result from a non-accused interpretation of the Challenged Claim – namely that consumers who interpreted the Challenged Claim as intended (i.e., that the products contain specific natural ingredients) may still place a premium on the products based upon the Challenged Claim.  In such a case, removal of the Challenged Claim would cause a price change.  Dr. Dubé's proposed analysis cannot differentiate between a price change associated with Plaintiffs' allegations and a price change associated with the intended interpretation of the Challenged Claim.

REFERS TO HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER

reasons why individual inquiry into interpretation of the Challenged Claim are particularly
relevant.

a. It is likely that not all putative Class members were misled by the Challenged Claim
(as asserted by Plaintiffs). █████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████.

b. Consumers who interpreted the Challenged Claim as intended (i.e., that the products
contain specific natural ingredients as well as some synthetic ingredients) and thus
were not misled may still place a premium on the products based upon the Challenged
Claim. ████████████████████████████████████████████████████████████████
████████████████████████████████████████████ Thus, even if Dr. Dubé
identified a value associated with the Active Naturals claim as he proposes, that value
is likely driven in whole or in part by non-misleading interpretations of that claim. Dr.
Dubé has proposed no methodology to separate the impact of alleged misleading
interpretations of the Challenged Claim from non-misleading interpretations of the
Challenged Claim.

c. Even accepting *arguendo* Plaintiffs' allegations that some consumers misinterpreted
the Challenged Claim and placed value on the product because of that
misinterpretation, an appropriate determination of Class-wide damages would not
conflate the value from the alleged misleading interpretation with the value arising
from the non-misleading interpretation of the claim (as this would not constitute
economic harm attributable to the alleged wrongful conduct).

11. To be consistent with Plaintiffs' misleading claim assertion, Dr. Dubé must determine the
portion of the value attributable to the alleged misleading interpretation of the Challenged
Claim – because the Challenged Products have natural attributes that have value. Non-
misleading interpretations of the Challenged Claim highlighting the Challenged Products'
attributes could drive some or all of the value associated with the Active Naturals claim.
As stated in the Ugone Declaration, a consumer could attribute value to a non-misleading
presentation of the Active Naturals claim because it represents the inclusion of various
natural ingredients (while also understanding the products contain synthetic ingredients).

---

[16] Ugone Declaration, Section VII.B.

_____

The value associated with this interpretation would not appropriately be included in a reliable measure of damages associated with the alleged wrongful conduct.

### C. Willingness-To-Pay Is Not The Appropriate Measure Of Damages

12. In the Dubé Reply Declaration, Dr. Dubé provided additional clarity with respect to his calculation of a price premium and his proposed willingness-to-pay damages measures. While Dr. Dubé reiterates that he could calculate a price premium, he reasserts his intention to rely upon willingness-to-pay measures as the basis of his calculation of Class-wide damages. I discuss each of Dr. Dubé's claims with respect to his proposed damages measures below.

    a. **Dr. Dubé's Claim**. Dr. Dubé states that his method will calculate a price premium for the Challenged Claim.[17] He also states that "[c]onceptually, the proposed method could use the price premium as a measure of Class-wide damages."[18]

    **Response**. While Dr. Dubé claims he could calculate a price premium, this is not the primary calculation Dr. Dubé states he would present as his measure of claimed damages (as stated both in his initial report and in his deposition).[19] In addition, in his reply declaration, Dr. Dubé reiterated that he does not intend to use a price premium as a basis to determine Class-wide damages.[20] Thus, the observations in the Ugone Declaration specific to Dr. Dubé's lack of a calculation of a price premium as a measure of damages are applicable (in light of his intended lack of reliance on said price premium).

_____

[17] Dubé Reply Declaration, p. 8.

[18] Dubé Reply Declaration, p. 9. This section of my declaration focuses on the additional clarity Dr. Dubé presented in his reply declaration with respect to his calculation of a price premium and his proposed willingness-to-pay damages measure.

[19] Dubé Declaration, p. 1. *See also* Dubé Deposition, p. 243.

    Q: Can you show me where in your report you have any discussion of price premium as a damages measure?
    A: I do not have a discussion of a price premium as a damages measure.

    Q: And you are not proposing to do that, isn't that right?
    A: I have not proposed at this time to use the change in equilibrium prices themselves as a damages measure.

[20] Dubé Deposition, p. 243.

_____

Additionally, the observations in the Ugone Declaration with respect to Dr. Dubé's willingness-to-pay calculation are not alleviated by simply using the price premium described by Dr. Dubé as an alternative. For example, using a price premium as a damages measure would not alleviate (a) the need to determine the value associated with non-misleading interpretations of the Challenged Claim, (b) the necessity of obtaining appropriate data (which Dr. Dubé has not demonstrated he will be able to do), and (c) the various individual inquiry issues raised in the Ugone Declaration.[21]

Further, Dr. Dubé's estimation of a claimed price premium still would depend upon the assumptions that are not reasonable as outlined in the Ugone Declaration such as:[22] (a) consumers only purchase a single unit of a particular product at a time;[23] (b) consumers in the market face the same purchase price (as opposed to consumers at one retailer paying a different price than at another retailer, or some consumers having access to discounts while others do not);[24] and (c) that the set of products Dr. Dubé assumes are available in a market are actually available for sale everywhere within the market.[25]

b. **<u>Dr. Dubé's Claim</u>**. Dr. Dubé reasserts that he intends to utilize a WTP measure that is equivalent to a "compensating variation" approach. That is, he intends to use as a damages measure the amount of money that would have to be paid to individuals to make them just as "well off" without the claim as they were with the claim (whereby the utility defined by his model provides a measure of how "well off" an individual is).[26]

_____

[21] These individual inquiry issues include: (a) the need to determine reasons for purchase (Ugone Declaration, **Section VII.A.**); (b) the need to determine the actual prices paid by individuals (Ugone Declaration, **Section VII.C.**); and (c) the need to determine at what price (if any) the putative Class members would have purchased the Challenged Products (Ugone Declaration, **Section VII.D.**).

[22] Ugone Declaration, **Section X.D.**

[23] Dr. Dubé asserts that the "single unit" purchase assumption is unlikely to be a problem. According to Dr. Dubé, he "find[s] it unlikely that consumers are routinely purchasing extensive amounts of variety in any one of the given H&B [health and beauty] product categories." However, he provides no supporting evidence to support his assertion that multiple purchases do not take place. While he states he could "re-define the choice occasion" to account for consumption of variety by using "the moment of consumption," it is not clear that Dr. Dubé plans to do so, nor did Dr. Dubé specify what additional data (if any) would be required for this extension. (Dubé Reply Declaration, p. 29.)

[24] Dr. Dubé asserts that there is no evidence of inter-city price variation across retailers and claims it is an empirical question. As I have stated elsewhere in this declaration, Dr. Dubé assumes price variation will not be an issue – without performing any affirmative investigation to support his assertion. Dr. Dubé also fails to discuss what level of price variation would be troubling and how he could adjust his model in the event such price variation is observed in the relevant markets. (Dubé Reply Declaration, p. 29.)

[25] Dr. Dubé points to the lack of affirmative evidence regarding product availability and, hence, implies that this is not an issue. However, the issue is appropriate issue for investigation. Dr. Dubé has failed to provide any substantive analysis that indicates how he could adjust his model if this is shown to be a problem after additional analysis of the underlying data. (Dubé Reply Declaration, p. 29.)

[26] Dubé Reply Declaration, p. 9.

**Response**.  Dr. Dubé's further elucidation of what he intends to calculate does not mean that WTP is an appropriate measure of damages.  The observations in the Ugone Declaration with respect to the issues of using WTP as a damages measure remain valid and utilizing WTP will provide an inappropriate measure of damages.  Dr. Dubé acknowledges that his proposed WTP damages measures are not equivalent to a price premium.[27]

It is important to note that Dr. Dubé's calculation of WTP (or compensating variation) depends upon comparing consumer utility in the actual world (i.e., where Aveeno products have the Challenged Claim) with an alternative presentation (i.e., where Aveeno products have the Challenged Claim removed).  However, consumer utility is not a verifiable metric as a measure of economic value (like price), but an economic concept underlying a model.  Unlike the difference in market price (which could in principle be measured directly and verified), there is no way to reliably verify how much money it takes an individual to have the same "utility" after the removal of the Challenged Claim.  While the concept of compensating variation can be very useful in numerous applications of economics from an academic perspective (e.g., in evaluating whether a hypothetical policy would harm the population on average), that does not imply that it is a useful measure of individual damages in class action matters as Dr. Dubé implies.  Essentially, there is a difference between a method being appropriate in certain settings where it is desired to determine (directionally) whether harm occurred compared to evaluating the precise dollar amount of that harm.

c.  **Dr. Dubé's Claim**.  Dr. Dubé attempts to justify the use of WTP as a superior measure to a price premium by stating that "[t]he price premium does not capture this difference between what a consumer thought was the delivered value…and what was actually the delivered value."[28]  He also states that "[t]he price premium only captures the firm's response to the removal of the Challenged Claim, on the supply side."[29]

**Response**.  Dr. Dubé's expanded description of his WTP shows a disconnect to what a price premium represents and further outlines the inappropriateness of using WTP as a

---

[27] Dubé Deposition, p. 246.

> Q:  What, in layman's terms, is a willingness-to-pay in this context?
> A:  It is the amount of money you would have to pay a consumer to make her as well off as she was in the factual world in this counterfactual world.

> Q:  That is not necessarily the same as the price premium, is it?
> A:  Again, you need to define a price premium for me.

> Q:  Price premium would be, theoretically the amount – let's just use this case – that J&JCC could charge by virtue of using the "Active Naturals" claim on the packaging.
> A:  That is different from that.

*See also* Ugone Declaration, **Section IX.A**.

[28] Dubé Reply Declaration, p. 9.

[29] Dubé Reply Declaration, p. 9.

REFERS TO HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER

_____

measure of damages in the current setting. Dr. Dubé's assertions that price premiums are driven only by supply side factors runs contrary to basic economic theory and is just not true. A market price premium (either for a product or a claim) is a result of the interaction of supply-side factors and demand-side factors and represents the overall value of the feature in the **marketplace**.

This is in direct contrast to Dr. Dubé's proposed WTP measure based upon consumer utility which is derived solely from what a consumer "thinks" or "believes" a trait is worth (to themselves).[30] It is not appropriate to assign damages based upon the intangible values placed upon features by individual consumers. It is inappropriate to assume that the value the market places on a trait (even if that value is zero) is not an appropriate measure of value when the alternative relies upon the intangible preferences of consumers as measured by Dr. Dubé's utility function.

d. **Dr. Dubé's Claim**. Dr. Dubé acknowledges that his proposed WTP measure "can be different across consumers" but claims that his "proposed method controls for differences across consumers in their utility weights."[31]

**Response**. Dr. Dubé's WTP measures necessarily have values that vary widely across individuals but Dr. Dubé proposes no methods to determine what that individual value would be for any putative Class member for the purposes of awarding damages.[32] Two points are worthy of note with respect to this observation.

- First, while there likely is a wide distribution of prices associated with the Challenged Products, the price paid by putative class members can be determined through individual inquiry and with the proper documentary evidence (e.g., receipts).

- Second, there are numerous issues with basing damages on an "average" metric when there will be no possible method to ascertain the individual values that are understood to vary widely. Most importantly, an "average" approach would compensate putative Class members who were not injured, overcompensate some

_____

[30] Conceptually, this comparison between WTP and a market price premium can be understood using an illustrative example. In particular, there are two concepts in economics relating to measures of value of a product: its "value in use" (i.e., the intrinsic value a person places on an object they own) or its "value in exchange" (i.e., the amount of money a person could obtain for that object if exchanged or sold in the market). The value of an object is determined by its "value in exchange." For example, if a person owns a 1969 Shelby Mustang that they have kept since high school, the intrinsic value of that car to the person may be extremely high in light of the nostalgia and other factors that make the car valuable to that person. This intrinsic value or "value in use" is similar to what Dr. Dubé would attempt to measure (i.e., (in this example) the value of the car as measured by the amount an individual would need to be compensated to be just as "well off" (utility-wise) with the car as without). However, the value of an object is typically thought of as the "value in exchange," or (in this example) the **market price** of the car if the car is sold or valued using market comparables. This market price is based upon demand and supply considerations and is the appropriate measure of value).

[31] Dubé Reply Declaration, p. 10.

[32] Ugone Declaration, **Section IX.D.**

_____

putative class members, and understate other putative class members (should a wrongful price premium be found).

**D. Dr. Dubé Does Not Alleviate Concerns Regarding The Workability Of His Proposed Methodology**

13. In the Ugone Declaration, I provided numerous observations related to the workability of Dr. Dubé's proposed methodology in practice. These criticisms are particularly salient in light of Dr. Dubé's reports and testimony only providing the barest outline of a textbook model without accompanying details or analysis necessary to provide proper assurances his model could be applied to this matter in a reliable manner. With respect to the concerns raised in the Ugone Declaration, Dr. Dubé responded with assurances such details could be handled, but without providing additional information or analyses. I discuss each of these issues in more detail below.

a. **Dr. Dubé's Claim**. With respect to the concerns I raised regarding the actual execution of Dr. Dubé's proposed analysis, Dr. Dubé lists additional literature and asserts that he will be able to execute his proposed analysis.[33]

**Response**. With respect to the concerns I raised regarding the actual execution of Dr. Dubé's proposed analysis, Dr. Dubé simply lists additional literature and asserts (without support) that he will be able to execute his proposed analysis in this matter.[34]

Dr. Dubé's assertions do not serve as sufficient guidance to the Court that the various unknown issues in this matter with respect to his proposed methodology (highlighted in the Ugone Declaration) will be addressed satisfactorily. While his proposed methodology has been utilized in related industries in the economic literature, that does not imply it will necessarily be sufficient given the facts and circumstances of this case.

b. **Dr. Dubé's Claim**. Dr. Dubé asserts that "categorization of the 90 products is not a problem" and that "[t]he products are categorized into 13 product categories."[35]

_____

[33] Dubé Reply Declaration, pp. 21 – 24.

[34] Dubé Reply Declaration, pp. 21 – 24.

[35] Dubé Reply Declaration, p. 25.

REFERS TO HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER

**Response**.

i. First, Dr. Dubé simply is making an assertion and has provided no analyses (empirical or otherwise) that the proposed 13 product categories are appropriate. (It should not be lost that Dr. Dubé knew very little about the different categories of Challenged Products at the time of his initial report and at the time of his deposition.[36])

ii. Second, it is not clear that 13 product categories will be sufficient nor has Dr. Dubé provided any analysis demonstrating that 13 product categories will be sufficient.[37] Dr. Dubé has made no analysis of the variability of the Challenged Products within each of the product categories (i.e., whether the products in these 13 potential categories are substantially similar). Dr. Dubé also has failed to provide any analysis of whether the Nielsen/IRI product categories he highlights will be appropriate for his proposed analysis.[38]

iii. Third, Dr. Dubé's assertions regarding the 13 product categories ignore additional geographic areas that will have a multiplicative impact on potential number of analyses that he would need to perform. For example, if Dr. Dubé performed a separate analysis for each of the three states at issue, the total analyses required would be multiplied by three, for a total of 39 separate analyses. If, as discussed in the Ugone Declaration, more granular geographic boundaries are utilized, the number of different analyses would increase proportionally.

c. **Dr. Dubé's Claim**. Dr. Dubé asserts that "the selection of competitor products to include is not a problem."[39]

---

[36] Dr. Dubé testified in his deposition that he was not aware of the number of Challenged Products nor precisely how many categories of products there were. (Dubé Deposition, pp. 44 – 46 and 50 – 51.)

[37] Dr. Dubé fails to acknowledge the statement I made in the Ugone Declaration relating to the categorization of Challenged Products into 13 categories as presented in Ugone Declaration, Exhibit 5: "The categorization is meant to be a high-level overview of the various products at issue in this matter and is not intended to reflect any opinion of the appropriate categories for any substantive economic analysis related to the Challenged Products." (Ugone Declaration, p. 26.)

[38] The Challenged Products are 90 Aveeno brand products bearing the Challenged Claim (i.e., "Active Naturals").

(AV_0158552 – 710 at 565, Means Exhibit 2.)) Also, while there are 90 Challenged Products, there are many more stock keeping units (i.e., SKU's) or unique packaging associated with Challenged Product sales. Based upon a review of Aveeno sales data, a particular Challenged Product can be sold in multiple configurations. For example, the 8 oz. Aveeno Daily Moisturizing Lotion is sold as a standalone item and in a twin-pack with two 8 oz. products. The 18 oz. Aveeno Daily Moisturizing Lotion is sold in combination with numerous other Aveeno Products (e.g., 2 oz. Active Naturals Daily Moisturizing Body Wash or 0.5 oz. Active Naturals Protect + Hydrate Lotion with SPF 30). Thus, there are many more than 90 unique configurations of the Challenged Products potentially available for sale during the Class Period. (MGOLD_EREV_019_00000001.xlsx, tab "GTS-US," rows 131, 148, and 163.)

[39] Dubé Reply Declaration, p. 25.

_____

**Response**.  Dr. Dubé provides no analysis of the competitor products and simply states that "[t]he IRI data include sales and pricing data for each of the products sold in a given product category."[40]  No examples or investigations were provided.  Without any actual analysis of the IRI data (or alternative sales data), Dr. Dubé cannot provide assurances that his data has sufficient information on each of the relevant competitors to implement his analysis (or any information about what those competitors will be for each of the potential categories).

d.  **Dr. Dubé's Claim**.  Dr. Dubé asserts that selection of product characteristics is not a problem and that the information may be available from IRI or another company like Gladson.[41]

**Response**.

i.  First, Dr. Dubé often asserts the equivalent of "data availability is not a problem." That is not the equivalent of giving concrete assurances to the Court that (a) he can obtain the relevant data, (b) the appropriate data exists covering the proposed Class period for each required data set, and (c) the datasets can be combined to effectively implement his proposed methodology and obtain reliable results.

ii.  Second, it is not clear from the Dubé Report and Dubé Reply Declaration how he will alleviate the potential issues outlined in the Ugone Declaration should the data not be available.  For example, historical labeling claims and the timing of labeling changes are unlikely to be available for competitor products.  In addition, intrinsic traits of Challenged Products and competitor products that are not represented on product labels (e.g., the level of greasiness / non-greasiness or the rapidity with which the product is absorbed into the skin) are difficult (if not impossible) to reliably categorize and measure in a form useful as an input into an RCDE model.[42]  In any event, Dr. Dubé assumes (without confirmation) that he will obtain all the necessary data and does not outline for the Court how he will remedy the issues likely to arise if the data is not available.

iii.  Third, it is not clear from the Dubé Report and Dubé Reply Declaration what the relevant Challenged Product characteristics will be to include in his analysis, and thus he can provide no assurances that all necessary and relevant characteristics will be included in his model.

iv.  As he has made no attempts to analyze labeling information, Dr. Dubé can provide no assurances that the necessary characteristics will be reliably obtained for <u>competing products</u>.  Dr. Dubé states several sources he could potentially obtain labeling information from, but has not analyzed any such data to ensure that it is

_____

[40] Dubé Reply Declaration, p. 25.

[41] Dubé Reply Declaration, p. 25.

[42] Ugone Declaration, **Section X.B.**

REFERS TO HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER

sufficient and contains reliable historical label information for all products he intends to include in his model.

e. **Dr. Dubé's Claim**. Dr. Dubé asserts that products such as the Challenged Products do not frequently undergo reformulations or packaging changes.[43] He then claims that my assertions concerning such changes are purely speculative and lack examples.[44]

**Response**.

i. Dr. Dubé simply <u>asserts</u> (without any analysis) that products such as the Challenged Products do not frequently undergo reformulations or packaging changes.[45] There are at least two items of note with respect to this assertion. First, Dr. Dubé has provided no empirical evidence to support his assertion. Second, Dr. Dubé fails to acknowledge or recognize that even infrequent reformulations or packaging changes can have an impact on consumer demand with respect to the products incorporating such changes.

ii. In my experience, products are likely to undergo both reformulations and packaging changes in the course of a six-year Class period.



iii. Regardless of whether such labeling changes or reformulations occurred, Dr. Dubé's argument is irrelevant. This is an area for investigation, which Dr. Dubé has not done (nor outlined how he would do it if he intended to undertake such an

---

[43] Dubé Reply Declaration, p. 27.

[44] Dubé Reply Declaration, p. 27.

[45] Dubé Reply Declaration, p. 27.

[46] Declaration of Holly Means, dated November 11, 2015, p. 3.

[47] In many respects, Dr. Dubé's assertion that products such as the Challenged Products do not frequently undergo reformulations or packaging changes is in conflict with one of his claimed damages approaches. In one of Dr. Dubé's claimed damages approaches, he says he will calculate the WTP for the Challenged Claim with different market prices for Challenged and competing products when the Active Naturals claim is removed from the Challenged Products. (Dubé Report, p. 14. *See also* Dubé Deposition, pp. 238 – 243.) In other words, Dr. Dubé hypothesizes an entire market readjustment with the removal of the Challenged Claim. (With the likelihood that the 90 Challenged Products are in many separate and distinct markets, Dr. Dubé is hypothesizing that many different markets will readjust with the removal of the Challenged Claim.) ██████████████████████████████████

Without information relating to such Challenged Products' changes and the changes associated with the competitive products (during the market readjustment process as hypothesized by Dr. Dubé), it is not clear whether Dr. Dubé's framework will yield reliable results (within this framework presented by Dr. Dubé).

REFERS TO HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER

_____

investigation). Also, Dr. Dubé has not explained how he would handle this situation in his analysis if he was unable to get accurate reformulation or packaging data (if, for example, competitors did not retain or refused to produce accurate information on label change dates or reformulation dates). In my experience, it would not be unusual for a particular product to have different labels available for sale at various points in time (and in fact, numerous Challenged Products do have different labels as discussed above). Dr. Dubé's assertion (without empirical evidence or investigation) shows that his proposed analysis is based upon an incorrect assessment of the market for personal care products.

f. **Dr. Dubé's Claim**. Dr. Dubé asserts that the identification of relevant markets "will not be a problem" but confirms that he has "not yet determined the appropriate market definition."[48]

**Response**.

i. As support, Dr. Dubé simply highlights his experience and expects the Court to accept that his eventual description will be appropriate.[49] Dr. Dubé provides no analysis of any data to come to a conclusion about what a proper market definition will be.[50] This is not sufficient to provide proper assurances to the Court that this detail will be adequately addressed in any future analysis.

ii. Dr. Dubé does not provide any discussion of what he intends to do if he cannot define the appropriate market(s) in this case or if the data available do not have levels of detail consistent to support an appropriate market definition.

iii. Dr. Dubé does not provide any discussion of what he will do if the level of detail in the data available does not match the features of a properly defined market. There are numerous issues that could be reasonably expected to arise from data limitations that would impact the eventual execution of Dr. Dubé's model including, but not limited to: (a) inability to reliably determine which products are available for sale in various locations[51] and (b) inability to reliably measure separate premiums by geography.

_____

[48] Dubé Reply Declaration, p. 26.

[49] Specifically, Dr. Dubé states that "I [] have extensive experience working with CPG data. I therefore have no reason to believe there would be any problem using the subpoenaed IRI data for this case." (Dubé Reply Declaration, p. 26.)

[50] Within Dr. Dubé's RCDE model, he needs to define (a) the geographic boundaries in which products compete as well as (b) the set of products that compete against one another to fully define a "market." (Horizontal Merger Guidelines, U.S. Department of Justice and the Federal Trade Commission, Section 4. (https://www.ftc.gov/sites/default/files/ attachments/merger-review/100819hmg.pdf, viewed on January 18, 2016.))

[51] It is not uncommon in consumer products for certain regional items to not be available for sale nationwide. If for example, there are certain competitor products that are available in New York but not California (or in southern California but not northern California), Dr. Dubé would need data detailed enough to identify these features.

REFERS TO HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER

_____

    g.  **Dr. Dubé's Claim**.  With respect to the potential need for city-level data, Dr. Dubé dismisses this requirement and notes that in previous matters I have utilized national price data.  He points to the *Heidi Langan v. J&JCC* case ("Aveeno Wash") in particular.[52]

    **Response**.  Dr. Dubé's assertion is ill-informed.  In the cited Aveeno Wash matter, I utilized national price data to illustratively show the significant price variation with respect to the relevant products (much like the use of the online pricing data I presented in this matter).  While aggregate data can provide evidence of price variations, that does not imply it is appropriate to use aggregate data in this case for the purposes of calculating damages for putative Class members.  Dr. Dubé is mischaracterizing my prior work.  This particular use of national data does not obviate the potential requirement for detailed data (which Dr. Dubé has not demonstrated exists) to reliably determine Class-wide damages.[53]

### E.  Dr. Dubé's Proposed Treatment Of The Challenged Claim Variable In His Model Fails To Address Important Issues

14.    In one of the few areas Dr. Dubé provided additional details relating to how he plans to define his variables and execute his model in practice, Dr. Dubé fails to provide a method capable of addressing the numerous issues raised in the Ugone Declaration.  The Ugone Declaration highlighted the uncertainty with specifically how Dr. Dubé would treat the various ways in which the Challenged Claim are presented on the Aveeno packages (in light of various differences shown across the Challenged Products).  For example, the different presentations as to the specific Active Naturals ingredient(s) contained in the Challenged Products include: (1) front-facing claims specifying "Active Naturals" followed by the specific ingredient(s) in the product; (2) front-facing claims specifying natural ingredients without specifically mentioning "Active Naturals"; and (3) back-facing

_____

[52] Dubé Reply Declaration, pp. 26 – 27.

[53] In fact, evidence suggests that the value consumers place on natural claims can vary across geographies.  According to a 2013 Leatherhead Research study, "'natural' claims are certainly less important for the US consumer who is less willing to pay extra for these claims than his or her European counterpart."  ("Do 'Natural' Claims Cut the Mustard?"  Leatherhead Food Research, 2013.)  Similarly, it is reasonable to expect consumers in various geographies across the U.S. (such as between California and New York, or between Sacramento and Los Angeles) to place disparate values on "natural" type claims.

REFERS TO HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER

claims specifying "Active Naturals" followed by the specific ingredient(s) in the product (together with a definition of Active Naturals in many cases).[54]

15.    Dr. Dubé states that he plans to use a "yes" or "no" variable and will not differentiate between the location or presence of the additional information defining and clarifying the meaning of Active Naturals. It would seem that, from an economic perspective and from an informational content perspective, it would be important to capture additional information that defines and clarifies the meaning of Active Naturals.  Dr. Dubé's limited categorization for the Challenged Claim is insufficient to capture the informational content associated with the Aveeno labels described in detail in the Ugone Declaration.  The limited treatment proposed by Dr. Dubé fails to recognize (a) that different presentations of information may have different values to consumers (and thus should be treated differently) and (b) that different presentations may impact the likelihood (if any exists) that consumers hold the alleged misleading interpretation of the Challenged Claim (as opposed to a correct interpretation that may lead to value differences).

16.    By failing to incorporate these details into his analysis, Dr. Dubé will be unable to properly determine damages across the Challenged Products if the value attributable to the Active Naturals Claim varies by the type of labeling (or is influenced by the type of labeling).   Additionally, Dr. Dubé will not be able to adjust to account for consumers being less likely to misinterpret the claim (and thus be damaged in the manner alleged by Plaintiffs) if various clarifying and informative claims also are present on the Challenged Product packages.  Dr. Dubé does not acknowledge the importance of analyzing the Challenged Claim within the context in which it appears.

---

[54] Ugone Declaration, **Section VII.B.**

_____

### F. __There Likely Is Substantial Price Variation In The Market For Challenged Products__

17. Dr. Dubé argues that the illustrative evidence of substantial price variation presented in the Ugone Declaration is not sufficient. I presented an illustrative analysis of online prices to show the potential variation in the prices of Challenged Products paid by putative Class members.[55] Dr. Dubé dismisses this analysis, stating that this "evidence consists of a non-random sample of select Aveeno products" and "[t]he fact that one vendor posts a much higher price does not imply that more than a trivial fraction of consumers ever paid that price."[56] However, rather than perform any analysis to show conclusively that the illustrative evidence is not indicative of market-wide trends, Dr. Dubé simply asserts there is not reliable evidence to demonstrate price variability.[57] There are numerous flaws with Dr. Dubé's limited criticism including at least the following:

    a. Dr. Dubé fails to acknowledge or admit that the "illustrative analysis of online prices" represents actual prices consumers face (no matter how much he tries to dismiss these prices). Regardless of how many consumers actually purchased Challenged Products at these prices from these online outlets, consumers in each state at issue faced these prices for the Challenged Products and could have purchased them at these prices.

    b. I do not assert that these online prices are representative of all prices, but only that price variability is likely to exist (a point Dr. Dubé has not empirically dismissed). It is not appropriate for Dr. Dubé to dismiss illustrative evidence as insufficient when providing **no** analysis or evidence to the contrary.

    c. According to Dr. Dubé, "[t]he fact that one vendor posts a much higher price does not imply that more than a trivial fraction of consumers ever paid that price."[58] However, the price variation contained in the illustrative on-line prices I provided is not due to one vendor. The on-line prices I provided were for the Aveeno Active Naturals Nourish + Moisturize Shampoo 10.5 fl. oz. product. The on-line prices I provided were as follows: $5.97 (Walmart.com); $5.99 (Drugstore.com); $5.99 (Target.com);

_____

[55] Ugone Declaration, **Section VII.C.**

[56] Dubé Reply Declaration, p. 11.

[57] Dubé Reply Declaration, p. 11.

[58] Dubé Reply Declaration, p. 11.

_____

$6.49 (Aveeno.com); $7.49 (Walgreens.com); $7.99 (RiteAid.com); $8.32 (iherb.com); and $9.33 (Amazon.com).[59] Removing the Amazon.com price does not remove the on-line price variability associated with this product.

d.  Dr. Dubé does not address the fact that not only do online purchasers pay a variety of explicit prices, but they also receive additional discounts that Dr. Dubé does not account for in his analysis (e.g., volume discounts, automatic renewal discounts, loyalty-program points).[60] It is not clear (without individual inquiry) how any potential calculation of damages could account for differences in damages between consumers who purchase the product at full price and those who utilized discounts (particularly because "bargain hunter" shoppers who purchased the products precisely because they were discounted may place a different value on the Challenged Claim and thus should be treated separately in any calculation of damages).

e.  Dr. Dubé simply asserts without <u>any</u> analysis that there is not significant price variation to be a concern (without even describing what variation would be troublesome). Dr. Dubé provides an assertion that there is no evidence of extensive price variability (and thus implying that absent such evidence, it must not exist). Given the different geographic areas where sales take place, the six-year time period over which sales take place, and the variety of distribution channels over which sales take place, there is a high likelihood of significant price variability. I have shown that at least for a series of retailers that could all be accessed by many putative Class members, there is significant price variation. Dr. Dubé has made no effort to obtain any data or perform any affirmative analysis to show that the actual variation in purchase prices is *de minimis*. Absent such analysis it is not unreasonable to expect that there will be significant price variation in the marketplace (especially across promoted prices, geographic regions, channels of distribution, and time periods).

### G.  Preferences For Natural Products May Have Evolved Over Class Period

18.  A critical flaw in Dr. Dubé's application of conjoint analysis is the inability to account for changes in consumer preferences over time. In response, Dr. Dubé asserts that "[n]o reliable evidence has [sic] provided to suggest that consumer tastes for the Challenged Products or the Challenged Claim have evolved substantially over the time period of interest."[61] Dr. Dubé's criticism is inappropriate for at least the following reasons:

_____

[59] Ugone Declaration, **Section VII.C.2.**

[60] It is reasonable to expect similar categories of discounts to be available to consumers in brick-and-mortar retail outlets.

[61] Dubé Reply Declaration, p. 33.

REFERS TO HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER

a. First, to the extent that Dr. Dubé plans to use current survey data and apply such survey data to draw inferences as to consumers' tastes and preferences six years earlier, it is necessary for Dr. Dubé to affirmatively demonstrate that consumers' tastes and preferences have not changed (rather than simply assume this troubling feature does not exist absent direct evidence). Without such an affirmative demonstration, the results of Dr. Dubé's current (i.e., to be conducted) conjoint analysis could not be considered reliable if applied over a six-year period.

b. Second, Dr. Dubé again fails to capture the point of this criticism raised in the Ugone Declaration: this is an area for investigation, which Dr. Dubé has not done, nor has he explained how he would handle this situation in his analysis if tastes and preferences have changed. Dr. Dubé provides no discussion of how he will adjust his proposed methodology to address any evidence of changing preferences for "Aveeno Active Naturals" over time. In order to further explain the potential issue that Dr. Dubé ignores, consider the following illustrative example.

> Suppose Dr. Dubé executes his RCDE model and finds that the value attributable to the "Aveeno Active Naturals" variable actually decreased over the Class Period from $1.00 in 2010 to $0.50 in 2016 (at the time of a conjoint survey). Additionally, suppose his conjoint survey ascribes half the value to the Aveeno brand and half to the Active Naturals claim. Using his method, Dr. Dubé would conclude that the value of the Active Naturals claim is $0.25 in 2016. However, while in this example there is evidence that the value of "Aveeno Active Naturals" has decreased, it is **not clear** what the appropriate value of the "Active Naturals" claim would be in 2010. Would Dr. Dubé claim a constant value of the "Active Naturals" claim over time (i.e., the value of the claim is $0.25 in 2010), or a constant proportion of value over time (i.e., apply the 50% from the conjoint survey in this example to the $1.00 to arrive at a $0.50 value for "Active Naturals")? Not only is it not clear what Dr. Dubé would claim is the appropriate way to address this case, there is no reason (absent additional evidence Dr. Dubé cannot provide) to believe either of those potential values in 2010 (or an alternative value) would be the true value of the "Active Naturals" claim in the past. As illustrated in this example, Dr. Dubé's proposed methodology would have no way to reliably determine the value of the Active Naturals claim in 2010.

As demonstrated above, Dr. Dubé's conjoint analysis cannot reliably be used to apportion value between "Aveeno" and "Active Naturals" in the past. Dr. Dubé failed to discuss how he will address this common drawback of conjoint analysis in this scenario. In light of his lack of any preliminary analysis, Dr. Dubé should at least discuss how he would deal with drawbacks such as these – but he has not.

REFERS TO HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER

     c.   Third, Dr. Dubé does not address the observation I presented that sales patterns indicate that consumer preferences have changed,[62] at least with respect to their purchasing patterns associated with particular Challenged Products.

     d.   Fourth, Dr. Dubé's assertion that consumers' preferences for "natural" products have not changed over time is contrary to Plaintiffs' own allegations. Specifically, ███████████████████████████ On the other hand, a 2013 study by Leatherhead Research notes that "[t]here are some signs that the power of 'natural' claims could be waning."[64] This highlights the need to investigate the issue as it pertains to this matter (rather than simply assuming it does not exist).

19.     Dr. Dubé's lack of any substantive analysis of consumer preferences over time leads him to simply assert this is not an issue (rather than providing any evidence that preferences for the Challenged Claim have been constant over time). In light of the observations presented above, Dr. Dubé's unsupported assertions that the value attributable to a "natural" claim has not evolved over time are inappropriate. At a minimum, it is necessary for Dr. Dubé to at least investigate this issue or provide a discussion of how he will address this issue to make sure his results are relevant and reliable.

---

[62] Ugone Declaration, **Section XI.C.3.** █████████████████████████ Dr. Dubé (as stated in his deposition) claims that consumers' tastes and preferences for consumer products such as the Challenged Products are relatively constant over time. ████████████████████

███████████████████████████████████████████

     (*See* Ugone Declaration, **Exhibit 12.**)

[63] Plaintiffs' Memorandum Of Law In Support Of Motion For Class Certification dated September 18, 2015, p. 1.

[64] "Do 'Natural' Claims Cut the Mustard?" Leatherhead Food Research, 2013.

* * * * * *

20.    My analyses and opinions contained in this declaration are based upon information available to date.  I reserve the ability to review documents, deposition transcripts, or other information still to be produced by the Parties to this dispute and to supplement my opinions based upon that review.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed in Montreal, Canada on January 19, 2016.

_____
Keith R. Ugone, Ph.D.
January 19, 2016