UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL GOLDEMBERG, ANNIE LE, and
HOWARD PETLACK, on behalf of themselves and
all others similarly situated,

                    Plaintiffs,

   -against-

JOHNSON & JOHNSON CONSUMER
COMPANIES, INC.,

                    Defendant.

No. 13 Civ. 3073 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

      Plaintiffs Michael Goldemberg, Annie Le, and Howard Petlack ("Named Plaintiffs" or

"Plaintiffs") each bring consumer protection claims against Defendant Johnson & Johnson

Consumer Companies, Inc. ("Johnson & Johnson") in this proposed class action under the laws

of their home states: New York, California, and Florida, respectively. Pursuant to Fed. R. Civ. P.

Rule 23, Plaintiffs seek class certification of three classes of consumers that purchased any of 90

different Aveeno® Active Naturals® products during the class period within those particular

states. Defendant opposes class certification and seeks to preclude the preliminary report

prepared by Plaintiffs' damages expert as irrelevant and unreliable pursuant to Fed. R. Evid. 702

and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

      For the following reasons, Plaintiffs' motion is GRANTED as modified and Defendant's

motion is DENIED.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10|4|2016

# BACKGROUND

The Named Plaintiffs are purchasers of various products manufactured by Defendant Johnson & Johnson under the "Aveeno" brand labeled as "Active Naturals®." (Second Am. Compl. ("SAC") ¶ 1, ECF No. 42; Def. Answer to SAC ("Answer") ¶ 1, ECF No. 45.)

## I. Named Plaintiffs' Allegations Regarding the Active Naturals Products[1]

Plaintiffs challenge ninety different Aveeno products bearing the Active Naturals label that "contain unnatural, synthetic ingredients," which in their view renders the Active Naturals label false, deceptive, and misleading to consumers since the products are, in fact, "not natural." (SAC ¶ 1, 2, 4.) These products fall within many body care categories, including lotions, ointments, creams, shave gels, cleansers, scrubs, body wash, shower and bath oils, shampoos, and conditioners—some of which also contain sunblock. (*See* SAC ¶ 1.)

Plaintiffs allege the labeling creates the "impression amongst reasonable consumers that the [p]roducts are natural," without informing them of the "numerous synthetic, unnatural, and dangerous ingredients" that are only listed, without indicating if they are natural or not, "on the back of the [p]roduct packaging in small, hard-to-read print[.]" (SAC ¶ 13.) According to Plaintiffs, this impression is reinforced by Johnson & Johnson's website and social media presence, where the Aveeno brand touts the benefits of Active Naturals in contexts designed to "induce the purchaser into believing the [p]roducts are natural." (SAC ¶¶ 33-38.) For example, Plaintiffs suggest the Aveeno website creates such an impression (SAC ¶ 37) when it states:

> ACTIVE NATURALS® Ingredients
> We use only high-quality natural ingredients—grown in regions that provide an ideal environment for the plant to thrive and produce beneficial ACTIVE NATURALS® ingredients.

---

[1] For purposes of deciding a Rule 23 motion for class certification, the allegations set forth in the complaint are accepted as true, *see Shelter Realty Corp. v. Allied Maintenance Corp.*, 574 F.2d 656, 661 n.15 (2d Cir. 1978), and "material[s] outside the pleadings" are also considered as part of the certification decision. *Hirschfeld v. Stone*, 193 F.R.D. 175, 182 (S.D.N.Y. 2000) (citing *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 571 (2d Cir. 1982)).

Our scientists follow high standards of ingredient selection, formulation and manufacturing, with processes that retain the strength and purity of the ingredients.

Learn more about the magic of ACTIVE NATURALS® ingredients—sourced from nature, uniquely formulated and scientifically proven to deliver real skin and hair care benefits.

Plaintiffs contend that, due to this allegedly deceptive labeling and advertising plan, Johnson & Johnson was able to "command a premium price" by misleading consumers into purchasing the Aveeno Active Naturals products over other competing products. (SAC ¶ 10.) Absent such marketing practices, Plaintiffs "would not have purchased [the] Aveeno 'Active Naturals' [p]roducts or paid a price premium to purchase them." (SAC ¶ 14.) Specifically, Goldemberg would not have purchased or "paid a price premium" for the six products[2] he purchased. (SAC ¶ 18-19.) And, although he would prefer to continue using the products, he cannot as long as the labeling remains misleading. (SAC ¶ 20.) The same is true for Le regarding the ten products[3] she purchased (SAC ¶¶ 22-24), and for the four products[4] Petlack purchased (SAC ¶¶ 26-28). Between the three Named Plaintiffs, they purchased eighteen unique products out of this set prior to the commencement of this litigation.[5]

_____

[2] Goldemberg bought Aveeno Active Naturals Creamy Moisturizing Oil (12 fl. oz.), Therapeutic Shave Gel (7 fl. oz.), Positively Smooth Shave Gel (7 fl. oz.), Positively Nourishing Comforting Whipped Souffle (6 oz.), Nourish+ Moisturize Shampoo (10.5 fl. oz.), and Nourish+ Moisturize Conditioner (10.5 fl. oz.) starting two years prior to the commencement of the action.

[3] Le bought Aveeno Active Naturals products, including Daily Moisturizing Lotion (18 fl. oz.), Moisturizing Lotion with Broad Spectrum SPF 15 (12 fl. oz.), Skin Relief 24hr Moisturizing Lotion (12 fl. oz.), Positively Nourishing Energizing Body Lotion (7 oz.), Positively Ageless Firming Body Lotion (8 oz.), Positively Radiant Makeup Removing Wipes (25 count), Positively Ageless Youth Perfecting Moisturizer Broad Spectrum SPF 30 (2.5 fl. oz.), Positively Ageless Lifting & Firming Eye Cream (0.5 fl. oz.), Positively Radiant Daily Moisturizer Broad Spectrum SPF 15 (4 fl. oz.), and Daily Moisturizing Body Wash (18 fl. oz.) starting in 1998.

[4] Petlack bought Aveeno Active Naturals Daily Moisturizing Body Wash, Skin Relief Body Wash, Therapeutic Shave Gel (7 fl. oz.), and Moisturizing Bar (3.5 oz.) starting four years prior to this action commencing.

[5] Petlack and Goldemberg purchased the same Therapeutic Shave Gel, and Petlack and Le apparently purchased the same Daily Moisturizing Body Wash. *Compare supra* n.4 *with* n.2 & n.3.

In sum, "Plaintiffs and the other Class members purchased, purchased more of, or paid more for, the [p]roducts than they would have had they known the truth about the [p]roducts' unnaturalness[;] [therefore, they] have suffered injury in fact and lost money or property as a result of" Defendant's deceptive marketing practices. (SAC ¶ 48.)

## II.     Johnson & Johnson's View of Active Naturals®[6]

Defendant denies that the brand labeling is misleading. (Answer ¶ 151 & 152.) Johnson & Johnson asserts that it is clear—and undisputed by Plaintiffs—that at least one ingredient in an Active Naturals product is natural. Thus, a consumer would not be misled: the label indicates some, not all, of the ingredients are, from Aveeno's perspective, Active Naturals. (Def. Mem. in Opp'n to Mot. Cert. Class. ("Def. Opp'n Mem.") at 3, ECF No. 73.) Defendant also notes that the packaging in 14 of the 90 products has changed over time and that the Active Naturals "trademark" appears in various different configurations. (Def. Opp'n Mem. at 4, n.5.)

## III.    Procedural History

On May 7, 2013, Named Plaintiff Goldemberg commenced this action on behalf of himself and all others similarly situated alleging violations of New York General Business Law ("GBL") § 349, as well as breach of express warranties and unjust enrichment under New York common law. (Compl., ECF No. 1;[7] SAC ¶¶ 63-69, 70-76, 77-81.) On March 27, 2014, the Court denied Defendant's motion to dismiss the N.Y. GBL claims and the claims for breach of express warranties, but dismissed the unjust enrichment claims. (Mem. Order, ECF No. 20.)[8]

---

[6] Defendant has submitted an answer to the Second Amended Complaint, and various declarations, excerpts of deposition testimony, and documentary evidence in opposition to class certification.

[7] Plaintiffs amended their complaint on July 16, 2014, and again on August 29, 2014. (ECF Nos. 37 & 42.) The Second Amended Complaint (SAC) is the operative complaint in this action.

[8] Familiarity with the prior decision and facts contained therein is assumed. The Court reserved judgment on the issue of whether a named plaintiff had standing to bring claims on behalf of others where that plaintiff had not actually purchased certain products in question. *Goldemberg*, 8 F. Supp. 3d 467, 484 (S.D.N.Y. 2014). Additionally, the FDA is now considering the meaning of "natural," which is a change in the posture of the case

On June 26, 2014, the Court appointed Named Plaintiff Goldemberg as Interim Lead Plaintiff and appointed the predecessor firms of Finkelstein, Blankinship, Frei-Pearson & Garber, LLP and The Richman Law Group (Pearson & Garber LLP and Reese Richman LLP, respectively) as Interim Co-Lead Class Counsel. (ECF No. 34.)

On August 29, 2014, with the consent of Defendant, the complaint was amended, expanding the suit to include Named Plaintiffs Le and Petlack, along with all others similarly situated, and parallel claims based on the same allegations under California and Florida law, respectively. (SAC ¶¶ 82-122, 130-39.) Named Plaintiff Le asserts claims pursuant to California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq.*, Unfair Competition Law ("UCL"), Cal. Bus. & Prof Code § 17200 *et seq.*, and Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.* (collectively, the "California Statutes"). Named Plaintiff Petlack asserts claims pursuant to Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA" or the "Florida Statute"), Fla. Stat. § 501.201 *et seq.* Plaintiffs have abandoned the breach of warranties claims. (SAC ¶¶ 70-76, 123-29, 140-46; Pls. Mem. in Supp. of Mot. Cert. Class. ("Pls. Mem.") at n.24, ECF No. 70.)

Plaintiffs now move for class certification. (Mot. Cert. Class, ECF No. 69.) In support of certification, they proffer a damages model proposal prepared by their damages expert Dr. Jean-Pierre H. Dubé. (Pls. Mem. at 4; Decl. Todd S. Garber, Esq. in Supp. of Mot. Cert. Class ("Garber Decl."), ECF No. 71, Ex. 3 ("Dubé Report").) Defendant seeks to preclude Dr. Dubé's proffered damages model pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), as irrelevant and unreliable. (Mot. in Lim., ECF No. 80; Mem. in

---

from the motion to dismiss stage. *See In re KIND LLC "Healthy & All Natural" Litig.*, No. 15-MC-2645 (WHP), 2016 WL 4991471, at *2, *6 (S.D.N.Y. Sept. 15, 2016) (staying action).

Supp. of Mot. in Lim. ("Def. *Daubert* Mem.") at 8, 13, ECF No. 81.)  Defendant also opposes

certification on multiple grounds, devoting substantial energy to perceived failings under the

predominance requirement, arguing that consumer buying preferences make it impossible to

determine liability generally and that without a cohesive damages model individual issues will

vastly predominate over common issues.  (Def. Opp'n Mem. at 8-23.)

## CLASS STANDING STANDARD

For the purposes of class standing, a plaintiff must plausibly allege "(1) that he personally

has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and

(2) that such conduct implicates the same set of concerns as the conduct alleged to have caused

injury to other members of the putative class . . . ."  *Ret. Bd. of the Policemen's Annuity & Ben.*

*Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 161 (2d Cir. 2014).

## CLASS CERTIFICATION STANDARD

For a matter to proceed as a class action, a plaintiff must satisfy the four prerequisites of

numerosity, commonality, typicality, and adequacy, specifically demonstrating that: "(1) the

class is so numerous that joinder of all members is impracticable; (2) there are questions of law

or fact common to the class; (3) the claims or defenses of the representative parties are typical of

the claims or defenses of the class; and (4) the representative parties will fairly and adequately

protect the interests of the class."  Fed. R. Civ. P. 23(a).  "In addition, while Rule 23(a) does not

expressly require that a class be definite in order to be certified, a requirement that there be an

identifiable class has been implied by the courts.  This implied requirement is often referred to as

'ascertainability.'"  *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*, 209

F.R.D. 323, 336 (S.D.N.Y. 2002) (internal quotes and citations omitted).  The party seeking class

certification bears the burden of satisfying Rule 23's prerequisites by a preponderance of the

evidence. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

In addition to satisfying the Rule 23(a) prerequisites, the plaintiff must qualify the proposed class under at least one of three subsection Rule 23(b) categories. Fed. R. Civ. P. 23(b); *see also Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010). Plaintiffs move under Rule 23(b)(2) and (b)(3). (*See* Pls. Mem. at 13, 15).

Certification of a class under Rule 23(b)(2) is appropriate in cases where the defendant "has refused to act on grounds generally applicable to the class," thus entitling class members to "final injunctive relief." Fed. R. Civ. P. 23(b)(2). Such certification should occur only "where a single injunction would provide relief to each member of the class." *Sykes v. Mel S. Harris & Associates LLC*, 780 F.3d 70, 80 (2d Cir. 2015) (internal quotation, modification, and citation omitted), *aff'g* 285 F.R.D. 279 (S.D.N.Y. 2012). Where "plaintiffs are seeking substantial monetary damages," they should seek "certification of separate Rule 23(b)(2) and (b)(3) classes addressing equitable relief and damages, respectively." *See Sykes*, 285 F.R.D. at 293.

A Rule 23(b)(3) class may be certified upon finding that common legal or factual issues predominate over individual issues and that a class action is superior to other methods of adjudication. Fed. R. Civ. P. 23(b)(3). Plaintiffs need not prove, however, that the legal or factual issues that predominate will be answered in their favor. *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1196 (2013). "Individualized damages determinations alone cannot preclude certification under Rule 23(b)(3)," but it is a factor to "consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 408-09 (2d Cir. 2015). "[A]t the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be

consistent with its liability case" and "courts must conduct a rigorous analysis to determine whether that is so." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). "A model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the plaintiff's] theory [of liability]." *Id.*

A certifying court "must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 251 (2d Cir. 2011) (citing *In re IPO Secs. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006)). When expert testimony is submitted in support of class certification, neither the United States Supreme Court nor the Second Circuit has "definitively ruled on the extent to which a district court must undertake a *Daubert* analysis" of the proffered testimony. *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013) (district court considered admissibility of expert testimony but did not conduct a *Daubert* hearing).

Although "a court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 133 S. Ct. at 1194-95 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)). Any factual disputes relevant to satisfying each Rule 23 requirement should be resolved, but a court "should not assess any aspect of the merits *unrelated* to a Rule 23 requirement." *In re IPO Secs. Litig.*, 471 F.3d at 41 (emphasis added). A district court may later decertify a previously certified class if it becomes apparent that the requirements of Rule 23 are, in fact, not met. *See* Fed. R. Civ. P. 23(c)(1)(C).[9]

_____

[9] After certifying a class, the Court "must define the class and the class claims, issues, or defenses, and must appoint class counsel," considering the work counsel applying for appointment has already done in the action, counsel's relevant experience and knowledge of the applicable law, and the resources that counsel plans to dedicate to the action. *See* Fed. R. Civ. P. 23(c)(1)(B) & 23(g)(1)(A). When certifying a Rule 23(b)(3) class—requested by Plaintiffs here—the Court "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Id.* at (c)(2)(B).

### *DAUBERT* STANDARD

If a *Daubert* analysis is undertaken in connection with class certification, then under

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597

(1993):

> an expert with "specialized knowledge [that] will help the trier of fact" may testify so long as that testimony is "based on sufficient facts or data" and "is the product of reliable principles and methods" that the witness has "reliably applied . . . to the facts of the case." The proponent of the expert testimony has the burden to establish these admissibility requirements, with the district court acting as a "gatekeeper" to ensure that the "'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"

*In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (citations omitted). "The

'gatekeeping' function under *Daubert* is fundamentally about 'ensur[ing] the reliability and

relevancy of expert testimony[.]'" *Id.* The inquiry is, however, flexible—including "*how* to

determine reliability" with regard to the case at issue. *Id.* (emphasis in original).

### DISCUSSION

This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d).

Plaintiffs' case, at its core, turns on proof that "they were deceived by [Aveeno's] labeling, [that]

an objective, reasonable consumer also would have been deceived, and [that] such deception

injured them." *In re KIND LLC "Healthy & All Natural" Litig.*, No. 15-MC-2645 (WHP), 2016

WL 4991471, at *6 n.4 (S.D.N.Y. Sept. 15, 2016) (referencing GBL, UCL, FAL, CLRA, and

FDUTPA, amongst others). The statute of limitations period is either three or four years

depending on the particular statute.[10]

---

[10] Claims brought pursuant to N.Y. GBL §§ 349 & 350 are "subject to the three-year limitations period imposed by C.P.L.R. 214(2), which applies to actions 'to recover upon a liability . . . created or imposed by statute.'" *Corsello v. Verizon NY, Inc.*, 18 N.Y.3d 777, 789 (2012) (quoting *Gaidon v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201, 208 (2001)). The statute of limitations for actions under the California FAL or CLRA is also three years. Cal. Code Civ. Proc. § 338(a); Cal. Civ. Code § 1783. The statute of limitations for California UCL claims is four years. Cal. Bus. & Prof. Code § 17208. For the California claims, "ordinarily, the statute of

## I. Class Certification

Plaintiffs move for certification of: (1) "All persons who purchased Defendant's Products in New York during the applicable limitations period" (the "New York Class"); (2) "All persons who purchased Defendant's Products in California during the applicable limitations period" (the "California Class"); and (3) "All persons who purchased Defendant's Products in Florida during the applicable limitations period" (the "Florida Class").[11] (*See* Pls. Mem. at 2.) Plaintiffs' Rule 23(b)(2) classes seek "injunctive relief prohibiting Defendant from continuing the unlawful practice of making deceptive 'Active Naturals' representations" by prohibiting the use of the Active Naturals trademark on Defendant's labels. (Pls. Mem. at 15.) Their suggested Rule 23(b)(3) classes seek damages, statutory and compensatory, for the price premium paid as a result of the deceptive marketing of the Active Naturals products. (Pls. Mem. at 20-21.)

Defendant opposes certification under both subsections of Rule 23(b), and also argues that Plaintiffs cannot meet the prerequisites under Rule 23(a). The Court addresses certification under Rule 23(b)(3) first, given the amount of contention between the parties over whether the predominance requirements are satisfied.

### a. Rule 23(b)(3) Requirements

Under Rule 23(b)(3), this Court must determine if common legal or factual issues predominate over individual issues and if a class action is superior to other methods of adjudication. Fed. R. Civ. P. 23(b)(3).

---

limitations runs from the occurrence of the last element essential to the cause of action," which is the "moment a claim accrues." *Aryeh v. Canon Business Solutions, Inc.*, 292 P.3d 871, 875 (Cal. 2013) (quotations omitted). Finally, the statute of limitations under FDUTPA is four years. *See Marlborough Holdings Grp., Ltd. v. Azimut-Benetti, Spa, Platinum Yacht Collection No. Two, Inc.*, 505 F. App'x 899, 905 (11th Cir. 2013).

[11] Excluded from the three proposed class definitions "are current and former officers and directors of Defendant, members of the immediate families of the officers and directors of Defendant, [and] Defendant's legal representatives, heirs, successors, or assigns, and any entity in which they have or have had a controlling interest[.]" The undersigned ("the judicial officer to whom this lawsuit is assigned") is also excluded. (Pls. Mem. at 2 n.3.)

### i. Predominance

In *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002), the Second Circuit

explained the predominance requirement of Rule 23(b)(3) as follows:

> "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). It is a more demanding criterion than the commonality inquiry under Rule 23(a). *Id.* at 623–24. Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof. *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001).

Plaintiffs assert that all consumers were subjected to the same deceptive actions—the

labeling of Aveeno products with the Active Naturals trademark. (Pls. Mem. at 15.) They also

contend that the damages associated with any injury stemming from those actions can be

measured on a class-wide basis. (Pls. Mem. at 20-22.) In support of that contention they proffer

the damages proposal of Dr. Dubé. (*See* Dubé Report.) Dr. Dubé's purported damages

methodology assumes that the inclusion of the Active Naturals label on packaging or in

advertising is *in and of itself* objectively misleading. (Dubé Report ¶¶ 1, 37; *see also* Pls. Mem.

in Opp'n to Def. *Daubert* Mot. in Lim. ("Pls. *Daubert* Opp'n") at 10 (if the Active Naturals

trademark "is misleading to a reasonable consumer, then Professor Dubé's model can isolate the

value of the [trademark] attributable to Plaintiffs' theory of liability").

As this Court explained when considering this question on the motion to dismiss, the

potentially deceptive conduct here involves a "potentially misleading product trademark" with

"advertising that exclusively touts one particular aspect of the particular products," not "merely

claims about the products placed on the labels[.]" *Goldemberg*, 8 F. Supp. 3d 467, 479

(S.D.N.Y. 2014). It cannot be said "that the product labels are not misleading to a reasonable consumer" as a matter of law. *Id.* at 480. Nevertheless, "the presence of a disclaimer or other clarifying language may defeat a claim of deception[.]" *Id.* at 479-80 (quoting *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013)).

Plaintiffs' position is that "[a] reasonable consumer would understand and expect that a product labeled 'Active Naturals' would in fact be natural," and therefore the trademark is misleading because "the vast bulk of the ingredients are synthetic and artificial." (Pls. Mem. at 1; SAC ¶ 13.) Defendant counters that the phrase is not understood to mean "100% natural" but rather "select 'natural ingredients' that provide 'proven benefits.'" (Def. Opp'n Mem. at 3 (citing Decl. of Holly Means dated Nov. 11, 2015 ("Means Decl."), Exs. 1 & 2).) Although the Court has already noted that "'Aveeno® Active Naturals®,' arguably suggests one or two natural ingredients instead of all, if not by name then by description," it is ultimately a question of fact whether the trademark misleads consumers. *Goldemberg*, 8 F. Supp. 3d at 475.

Because the Court is no longer at the pleading stage, to certify the proposed classes, it must consider how the existence of any disclaimers or clarifying language, or the arrangement of the label on a particular product, will impact Plaintiffs' ability to prove their claims on a generalized basis. Defendant contends that because "the challenged representation appears in a variety of ways across the various products, often accompanied by explanatory or contextualizing language," there is a "substantial divergence in the evidence required" for each potential plaintiff's claim. (Def. Opp'n Mem. at 24-25.) Ostensibly, based on Defendant's argument, different proof will be required for each of the products—or at least for each unique formulation of the product labeling. Similarly, each advertisement would need to be considered for the context in which the Active Naturals trademark was used and the product or products to

which it related.  Defendant therefore asserts that Plaintiffs will be unable to prove their claims on a generalized basis.[12]

Defendant thus vehemently contests the suitability of this case for class action treatment, specifically on the grounds of predominance, asserting that (1) "individual understandings of the many uses of 'Active Naturals'" will predominate over any common questions answerable by generalized proof; (2) "idiosyncratic consumer preferences drive purchases of this kind," making class-wide causation determinations impossible; and (3) Plaintiffs' expert's damages proposal is not tied to their theory of liability and is otherwise "totally inadequate" for determining class-wide damages.  (Def. Opp'n Mem. at 2.)

The Court will first consider whether the truth or falsity of, or the misleading or non-misleading nature of, the label for the products can be determined on the basis of "generalized proof" rather than subjective "individualized proof" before deciding whether Dr. Dubé's methodology supports a class-wide damages determination.  *See Comcast*, 133 S.Ct. at 1433 (plaintiffs' damages model "must be consistent with [their] liability case," and must "measure only those damages attributable to that theory").

### 1.  Can the misleading nature of the Active Naturals label be determined on an objective basis?

Defendant correctly argues that the trademark can never be proven to be "literally false" because its meaning is open to interpretation.  *See Merck Eprova AG v. Gnosis Sp.A.*, 901 F. Supp. 2d 436, 450 (S.D.N.Y. 2012) ("To be literally false, the message must be unambiguous; if the representation is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false . . . ."), *aff'd* 760 F.3d 247 (2d Cir. 2014).  Defendant's reliance,

---

[12] An aspect of these arguments holds true with regard to the 72 products Plaintiffs did not purchase.  *See infra* Section I.a.i.2 (class standing).

however, on *Astiana v. Kashi*, 291 F.R.D. 493 (S.D. Cal. 2013), is misplaced. There, the court denied certification of an "all natural" class because of the wide-ranging views on what "natural" might mean, but granted certification on a "nothing artificial" class because the plaintiffs' evidence more plainly demonstrated that "nothing artificial" was understood to mean the absence of synthetic items. *Id.* at 508 ("Even the named plaintiffs disagree about the definition of 'All Natural'").

Here, the Named Plaintiffs all claim to have been misled by the Active Naturals marketing to believe the products were more natural than not—which is not what Defendant argues the trademark is supposed to mean. While not in exact agreement, all of the Plaintiffs allege they were deceived to a certain degree. *See infra* Section I.c.iii (typicality requirement). Therefore, the Court adopts the premise that the common question is not whether the Active Naturals trademark can be proven false, but instead is "whether it is deceptive to label the [p]roducts with the . . . trademark 'Active Naturals'" because such labeling of the products (and the marketing scheme surrounding that label) would deceive a consumer. (*See* Pls. Mem. at 9.)

The predominance analysis considers whether that common question is capable of common answers *on the basis of generalized proof—i.e.* whether an "objective, reasonable consumer" would be deceived.

### a. The New York Class

New York provides a private right of action to "any person who has been injured" due to "[d]eceptive acts or practices" or "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in [New York.]" N.Y. Gen. Bus. Law § 349(h) & (a), § 350; *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 n.1 (2002) (the "standard for recovery" under the two statutes is "identical"). A plaintiff using that right of action must ultimately "prove three elements: first, that the challenged act or practice was consumer-

oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409 (S.D.N.Y. 2015). "The New York Court of Appeals has adopted an objective definition of 'misleading,' under which the alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995)); *see also Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000). A defendant's intent is irrelevant, unless the plaintiff seeks treble damages on the basis of an intent to defraud or mislead. *Oswego*, 85 N.Y.2d at 26.

Thus, the potentially common question of whether a given product's advertising set (including the Active Natural's label, packaging, and associated advertising) is misleading can be measured under an objective standard: whether it was "likely to have misle[d] a reasonable consumer acting reasonably under the circumstances." *Oswego*, 85 N.Y.2d at 26. By grouping the determination by product, there are less issues implicating individual class member's particular situations. Assuming the product and its labeling and packaging remains constant and is uniform between consumers, then the only question is how such packaging would have influenced a consumer under the objective test. *See Solomon v. Bell Atl. Corp.*, 9 A.D.3d 49, 52-53 (1st Dep't 2004) (certification "may be appropriate where the plaintiffs allege that all members of the class were exposed to the same misrepresentations").

But, if it is not demonstrated that "all members of the class saw the same advertisements" or if the content of the "advertising varied widely and not all the advertisements contained the alleged misrepresentations," then "questions of individual members' exposure to the allegedly

deceptive advertising [would] predominate" on those claims. *Id.* at 53. For that reason, the

advertising claims, which would require individualized showings as to exposure to the

company's website or Facebook page (*see* SAC ¶¶ 33-34) are not suitable for inclusion in the

proposed class.

The product specific labeling and packaging claims, however, do not require proof as to

individual understandings and can be judged based on the objective standard provided. (*See* Pls.

Mem. at 4.) Though this is not the more straightforward case of establishing that a label presents

a provably false claim, *see In re Scotts*, 304 F.R.D. at 409 (misleading nature of "50% thicker

claim" presented a common question answerable by generalized proof), generalized proof as to

what message the packaging set conveys will satisfy the inquiry. *See, e.g.*, *Belfiore v. Procter &

Gamble Co.*, 311 F.R.D. 29, 69 (E.D.N.Y. 2015) (what "flushable" meant and whether a product

was "flushable" presented common questions that predominated); *Guido v. L'Oreal, USA, Inc.*,

No. 11 Civ. 1067 (CAS) (JCX), 2013 WL 3353857, at *12 (C.D. Cal. July 1, 2013) ("whether a

reasonable consumer would have been deceived by [a product's] packaging is an objective

inquiry that focuses on that packaging. Common questions therefore predominate regarding [the

producer's] liability under the New York consumer protection statutes."). The materiality of

potentially deceptive representations is similarly subject to objective proof. *In re Scotts*, 304

F.R.D. at 409 ("materiality 'is a question common to all members of the class' when, as here, the

materiality of an alleged misrepresentation is judged according to an objective standard").

Therefore, common questions predominate over individual issues under New York law

with regard to the deceptive quality of a particular product's inclusion of the Active Naturals

trademark in its packaging.

### b.   *The California Class*

The same analysis holds true under California law.  The UCL, FAL, and CLRA "cover interrelated harms" and are also governed by a "reasonable consumer" test.  *Fisher v. Monster Beverage Corp.*, --- F. App'x ----, No. 13-57094, 2016 WL 3645098, at *1 (9th Cir. July 8, 2016); *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).  A "Plaintiff must 'show that members of the public are likely to be deceived.'"  *Ebner v. Fresh, Inc.*, --- F.3d ----, No. 13-56644, 2016 WL 5389307, at *5 (9th Cir. Sept. 27, 2016) (quoting *Williams*, 552 F.3d at 938).  "The objective test[s] . . . 'under the UCL, FAL, and CLRA [are] ideal for class certification because they will not require the court to investigate class members' individual interaction with the product.'"  *In re Scotts*, 304 F.R.D. at 410 (quoting *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012)).

Defendant notes that the packaging of certain products changed over time, which could present individual issues regarding which packaging a class member actually viewed, similar to the problems associated with the advertising discussed above.  However, since the packaging only changed on two of the products that Plaintiff Le purchased (*see* Means Decl., Ex 3 (Daily Moisturizing Lotion (18 fl. oz.)[13] and Daily Moisturizing Body Wash (18 fl. oz.)), the solution is to simply exclude those products from any class definition along with the advertising claims that are subject to individualized proof.  *See Kosta v. Del Monte Foods, Inc.*, 308 F.R.D. 217, 229 (N.D. Cal. 2015) (in related commonality inquiry court noted that "[w]ith respect to the question of whether the challenged labels and packaging are unlawful, unfair, deceptive, or misleading,

---

[13] Because this product is excluded from the class definition, Defendant's contention that Le's claims are stale is irrelevant.  (*See* Def. Opp'n Mem. at 25-26 (contesting the reliability of Le's testimony that she purchased any of the products during the limitations period because during her deposition she first indicated that she stopped purchasing Active Naturals around 2008, but then later, after an off the record break, cabined that statement to only the lotion she had purchased).)

the variations are so great that at least half the challenged products would not evidence the violations alleged," in part "because they did not appear on the products"); *Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581, 595 (9th Cir. 2012) (no presumption of reliance where "it is likely that many class members were never exposed to the allegedly misleading advertisements").

With those products removed from consideration, along with the advertisement claims, common questions predominate over individual issues.

### c.   The Florida Class

For claims brought under FDUTPA, a "plaintiff must prove that 'the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.'" *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565, 567 (11th Cir. 2009) (finding that "a consumer acting reasonably would [not] have been deceived by" statements when "viewed in light of the circumstances as a whole"). FDUTPA employs a "hybrid standard," which can be "objectively established as to mindset but subjectively established as to context." *In re Motions to Certify Classes Against Court Reporting Firms for Charges Relating to Word Indices*, 715 F. Supp. 2d 1265, 1282 (S.D. Fla. 2010), *aff'd sub nom. Webber v. Esquire Deposition Servs., LLC*, 439 F. App'x 849, 851 (11th Cir. 2011) (affirming denial of class certification and noting that "differences in the circumstances under which putative class members purchased transcripts from the court-reporting firms create many individualized factual and legal issues with respect to the FDUTPA claim").

This hybrid standard similarly lends itself to considering the claims on a product by product basis, analyzing the Active Naturals label and packaging as a group. But in light of the subjective portion of the standard and analyzing the context surrounding the deceptive conduct, as with the other classes, changing packaging can present individual issues regarding which

packaging a class member actually viewed. This requires the two products that Named Plaintiff

Petlack purchased where the packaging changed to be excluded from the class definition. (*See*

Means Decl. Ex 3 (Daily Moisturizing Body Wash and Skin Relief Body Wash).) For the same

reasons, the advertising claims must also be excluded. *See Randolph v. J.M. Smucker Co.*, 303

F.R.D. 679, 689 (S.D. Fla. 2014) (because "certain products did not bear the challenged

labelling" and some products "did not contain the alleged misrepresentation during the entire

class period," it resulted in "factual discrepancies creat[ing] individualized factual issues").

By grouping the claims by product and thus making context uniform, the subjective

element falls away and the test focuses on the objective question of whether the Active Naturals

brand in that context was misleading, which is essentially the same as the New York test.

*Compare Cohen*, 498 F.3d at 126 ("likely to mislead a reasonable consumer acting reasonably

under the circumstances"), *with Cold Stone Creamery*, 332 F. App'x at 567 ("likely to deceive a

consumer acting reasonably in the same circumstances"); *Fitzpatrick v. General Mills, Inc.*, 635

F.3d 1279, 1283 (11th Cir. 2011) (approving conclusion that "FDUTPA claim rises or falls based

predominantly on issues for which class[-]wide proof is appropriate" in class action alleging

deceptive marketing of the "digestive health benefits" associated with probiotic yogurt).

Common questions, therefore, predominate over individual issues.

> **2. Do the Named Plaintiffs have class standing, in light of the objectivity of the tests under the statutes, to assert claims based on products they did not purchase?**

Because the Named Plaintiffs have purchased only 18 of the 90 products bearing the

allegedly deceptive label and subject to the misleading advertising campaign, the Court must also

consider whether the Named Plaintiffs have standing to bring claims on behalf of proposed class

members who may have purchased the remaining 72 products. Recent guidance from the

Second Circuit on this issue clarifies that class standing can be found where "the absent class

members' claims [are] similar to those of the named plaintiff in *all* essential respects[.]" *Ret. Bd. of the Policemen's Annuity & Ben. Fund*, 775 F.3d at 161-62 (emphasis added). When present, such similarities indicate "the named plaintiff ha[s] the right incentives, largely because the proof contemplated for all of the claims would be sufficiently similar." *Id.* (comparing *NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 164 (2d Cir. 2012) (class standing) with *DiMuro v. Clinique Labs., LLC*, 572 F. App'x 27, 29 (2d Cir. 2014) (summary order) (no class standing).

Thus, the class standing inquiry echoes some of the considerations of the predominance inquiry of Rule 23(b)(3). Aside from "suffering some actual injury as a result of the putatively illegal conduct of the defendant," the "conduct [must] implicate[] the same set of concerns as the conduct alleged to have" injured the absent members such that proof provided for a named plaintiff's claims will "answer the same questions" for the absent members' claims. *Id.* at 161, 162. Even though a single product can be judged under an objective standard, because Plaintiffs cannot demonstrate that the claims involving their 18 products are the same in *all essential respects* to the claims absent members would have for the other 72 products (the questions of proof are product specific), each Named Plaintiff only has standing on behalf of others with regard to products they actually purchased. *DiMuro v. Clinique Labs., LLC*, 572 F. App'x 27, 29 (2d Cir. 2014) (no standing to bring claims for unpurchased products where "each of the seven different products have different ingredients, and Clinique made different advertising claims for each product"); *see also Ret. Bd. of the Policemen's Annuity & Ben. Fund*, 775 F.3d at 161-62 (because "alleged misconduct [had to] be proved loan-by-loan and trust-by-trust" there was no indication that "answering the[] questions for the trusts in which Plaintiffs invested w[ould] answer the same questions for the numerous trusts in which they did not invest").

### 3. Are reliance and causation class-wide or individual questions?

As part of the predominance inquiry, the Court also considers Defendant's assertion that consumer buying preferences "atomiz[e] causation into millions of discreet inquiries," overwhelming any common questions presented by the allegedly deceptive marketing of the products. (Def. Opp'n Mem. at 2.) Defendant argues that "[t]hough the statutes on which plaintiffs rely at times permit an inference of causation, none of the [P]laintiffs has made a sufficient showing to be entitled to such an inference here." (Def. Opp'n Mem. at 13.) But the record belies that assertion. Each Named Plaintiff indicated they purchased Active Naturals products based on a misunderstanding of what the Active Naturals brand provided. (Goldemberg Tr. at 90-91, 97-98; Le Tr. at 37, 64; Petlack Tr. at 77, 81-82.)

For claims brought under New York's GBL, it does not matter whether a plaintiff justifiably relied on the deception. *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 940-41 (2012). And, "[t]o 'satisf[y] the causation requirement' under the GBL, '[n]othing more is required' than that a plaintiff suffer a loss 'because of defendant['s] deceptive act.'" *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 147 (S.D.N.Y. 2014) (quoting *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 30 (2000)).

Although the California statutes require reliance and causation—that "plaintiff saw and relied on the representations for their truth in purchasing the item, and . . . would not have bought the item otherwise"—*Fisher*, 2016 WL 3645098, at *1—"a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009). "A representation is material if a reasonable person would find it important in choosing a course of action." *Sandoval v. Pharmacare US, Inc.*, Nos. 15 Civ. 0738 & 15 Civ. 0120 (MLH) (JLB), 2016 WL 3554919, at *4 (S.D. Cal. June 10, 2016) (denying class certification where "Plaintiffs did not submit sufficient evidence that

the representations were material to consumers"); *see also In re ConAgra Foods, Inc.*

*("ConAgra II")*, 90 F. Supp. 3d 919, 983 (C.D. Cal. 2015) ("a California class suing under the

state's consumer protection statutes need not show individualized reliance if it can establish the

materiality of [the] label to a reasonable consumer"); *Algarin v. Maybelline, LLC*, 300 F.R.D.

444, 453 (S.D. Cal. 2014) ("Plaintiffs [under the California Statutes] may satisfy their burden of

showing causation as to each by showing materiality as to all").

Finally, "Florida law does not require proof of reliance." *Fitzpatrick v. General Mills,*

*Inc.*, 263 F.R.D. 687, 697 (S.D. Fla. 2010) (because "each plaintiff seeking damages under the

FDUTPA is only required to prove that [defendant's] conduct would deceive an objective

reasonable consumer, and not that the deceptive act motivated their particular purchase

decision . . . the putative class members would rely on the same pool of evidence to prove their

claims"), *remanded for further consideration*, 635 F.3d at 1283 (11th Cir. 2011) (approving

certification analysis but remanding to allow district court to correct class definition to "not take

individual reliance into account"); *Davis v. Powertel, Inc.*, 776 So.2d 971, 974 (Fla. Dist. Ct.

App. 2000) ("[T]he question is not whether the plaintiff actually relied on the alleged deceptive

trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the

same circumstances.").

There is nothing to suggest at this time that questions of reliance or causation are

"atomized" for the remaining potential class members.  Plaintiffs' purchases as a result of the

deceptive conduct support providing the inference of reliance or causation, generally available in

consumer class actions of this variety, for their respective classes.  The continued viability of

these inferences will hinge on the answer to the common question of materiality.

### 4. Can damages for the injury—purchasing a product with a misleading label—be determined on a class-wide basis?

Since the Court agrees with Defendant's characterization of Plaintiffs' case—that there are "Active Naturals claims, each particular to the Product" (Def. Opp'n Mem. at 5)—and finds there are common questions of liability for each product that can be answered by generalized proof as to whether the advertising scheme was misleading, the next consideration is whether an alleged injury for purchasing a product with such a deceptive label and the damages associated with that injury can be proven on a class-wide basis.

"All that is required at class certification is that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Sykes*, 780 F.3d at 88 (internal quotation and citation omitted). The Supreme Court's decision in *Comcast* requires "only that 'courts should examine the proposed damages methodology at the certification stage to ensure that it is consistent with the class[-]wide theory of liability and capable of measurement on a class[-]wide basis.'" *In re Scotts*, 304 F.R.D. at 414 (quoting *In re U.S. Foodservice*, 729 F.3d at 123 n.8). But even if they are not, "it is still 'clear that individualized monetary claims belong in Rule 23(b)(3).'" *Sykes*, 780 F.3d at 88 (quoting *Dukes*, 131 S.Ct. at 2558); *accord Roach*, 778 F.3d at 407 ("proponents of class certification [need not] rely upon a class[-]wide damages model to demonstrate predominance").[14]

Payment of a price premium serves as proof of injury under the laws of each applicable state. Under New York's GBL, if a plaintiff seeks compensatory damages, then the deceptive act or practice has to have "caused *actual*, although not necessarily pecuniary, harm." *Oswego*, 85

---

[14] Approvingly cited by the Second Circuit in *Roach*, the Seventh Circuit explained in *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013), that "the fact that damages are not identical across all class members should not preclude class certification" if there are common issues of liability. "[T]he damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses." *Id.*

N.Y.2d at 26.  Deception alone does not constitute an injury under the statutes.  *See Kacocha v. Nestle Purina Petcare Co.*, No. 15 Civ. 5489 (KMK), 2016 WL 4367991, at *13 (S.D.N.Y. Aug. 12, 2016) (citing *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 56 (1999)) (rejecting that "consumers who buy a product that they would not have purchased, absent a manufacturer's deceptive commercial practices, have suffered an injury under [GBL] § 349").  "Injury is adequately alleged under GBL §§ 349 or 350 by a claim that a plaintiff paid a premium for a product based on defendants' inaccurate representations."  *Ackerman v. Coca-Cola Co.*, No. 09 Civ. 0395 (JG), 2010 WL 2925955, at *23 (E.D.N.Y. July 21, 2010).  Similarly, because the "UCL and false advertising law are both intended to preserve fair competition and protect consumers from market distortions," harm occurs for the purposes of the California Statutes "at the moment of purchase" once a buyer is "forced to pay more than he or she would have" absent the deceptive conduct.  *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 893 (Cal. 2011).  The California Statutes and the Florida statute both accept the payment of a price premium as evidence of an injury.  *Marty v. Anheuser-Busch Companies, LLC*, 43 F. Supp. 3d 1333, 1346 (S.D. Fla. 2014) ("premium price theory of damages has been recognized by multiple courts interpreting the state law consumer protection statutes" of New York, California, and Florida).

Plaintiffs suggest damages can be measured class-wide, offering a proposed methodology by their damages expert Dr. Dubé.  (Pls. Mem. at 4.)  Defendant disparages Dr. Dubé's proposal as unreliable (*see* Def. *Daubert* Mem. at 13)—and argues that with or without the report Plaintiffs' cannot demonstrate class-wide damages because their damages model is not consistent with their theory of liability.  (Def. Opp'n Mem. at 2, 16.)  Considering the price premium theory Plaintiffs' allege, which satisfies the actual harm requirements of all three statutory schemes,[15]

---

[15] Even though New York's framework provides for statutory damages, it also requires "actual, although not necessarily pecuniary, harm," *Oswego*, 85 N.Y.2d at 26, which has been satisfied by a showing that a plaintiff

this Court looks at Dr. Dubé's report for the sole purpose of determining what the proposed model may be able to accomplish.[16]  *See In re Scotts*, 304 F.R.D. at 413 ("[N]othing in *Comcast* requires an expert to perform his analyses at the [] certification stage.").

In performing its gatekeeping function, this Court utilizes the flexibility provided by *Daubert* to craft an inquiry into the reliability of the proposed model, *see In re Pfizer*, 819 F.3d at 658, that takes into consideration what the Court needs to be assured of at the class certification stage: (1) that it is consistent with Plaintiffs' damages theory, and (2) that it measures damages only attributable to that theory.

### a. Consistency between the Proposed Model and the Price Premium Theory

The model is designed to discern the value associated with individual attributes of a given product (by looking at the consumer's willingness-to-pay), and then separate the value of the "Active Naturals" labelling from the Aveeno brand name—accounting for the potential that prices across all competitor products may change (the equilibrium prices) if the "Active Naturals" label was not part of the calculus.  (*See* Dubé Report ¶ 15.)  This is a far more complicated method than what *Comcast* requires—that Plaintiffs match their model to the liability theory.  Calculating a price premium can be as simple as computing the difference between the cost of the second best product in the product class (without a deceiving label) and the cost of the product at issue (with the label).  *See, e.g.*, *Ebin v. Kangadis Food Inc.*, 297

---

paid a price premium.  *Ackerman*, 2010 WL 2925955, at *23.  Requiring a showing of a price premium is also appropriate where a class action, like this one, benefits from being filed in federal court as opposed to state court.  *See Belfiore*, 311 F.R.D. at 59 (discussing the preemption of New York's prohibition on class actions seeking statutory damages by the federal rules).

[16] The Court notes that Dubé has already indicated that the analysis could be grouped based on product or product categories, much in the same way the Court grouped the conduct around the specific products.  (*See* Dubé Reply ¶¶ 7(vii), 70, 97; Pls. *Daubert* Opp'n at 16.)

F.R.D. 561, 571-72 (S.D.N.Y. 2014) (the difference between the market price of 100% olive oil and the market price of the less expensive olive-pomace oil was the price premium associated with the deceptive advertisement).

Dr. Dubé proposes to more accurately calculate the portion of the product's value associated with the deceptive claim. *Cf. In re Scotts*, 304 F.R.D. at 413 ("Although [expert's] declaration [] does not explain that he will isolate the premium associated with the 50% thicker claim, he made clear at his deposition he intends to do so"). Defendant's assertion that Dubé's model fails to consider the necessity of such an isolation is a vast oversimplification. (*Compare* Def. Opp'n Mem. at 18 n.16 (quoting testimony from Dr. Dubé's deposition: "I have not proposed at this time to use the change in equilibrium prices *themselves* as a damages measure") (emphasis added) *with* Dubé Report ¶ 38 (eventually the model will "compute the damages associated with the use of the [Active Naturals trademark] on Aveeno packaging") and Decl. Todd S. Garber, Esq. in Supp. of Pls. Reply Mem. in Supp. of Mot. Class Cert. ("Pls. Reply"), Ex. 7 ("Dubé Reply Report") at ¶ 7(iii) ("the proposed approach reflects the predicted changes in demand by consumers in response to the removal of the Challenged Claim and the corresponding price premium").)

The model proposed by Plaintiffs actually attempts to more accurately compute damages and happens to calculate a more generic price premium along the way. (Dubé Reply Report ¶ 7(iv) ("my proposed measure is a more comprehensive measure of [c]lass-wide damages than the price premium"), ¶ 18 ("Even though my proposed method does compute the price premium, [my report] does not propose to use the price premium alone as the measure of [c]lass-wide damages," because that "could be considered an incomplete measure of [c]lass-wide damages").)

In any event, the Court need only decide if the proposal is capable of matching the liability case to the damages case, which it certainly appears to be able to do.[17]

>    b.  *Ability of the Proposed Model to Measure Damages*
>        *Only Attributable to the Price Premium Theory*

Defendant rehashes the reliance and causation arguments by arguing the model must "isolate the price premium associated with misleading consumers *in [the] particular fashion*" alleged in the complaint (Def. *Daubert* Mem. at 9)—*i.e.* the damages associated with those that were, in fact, misled. But the inferences of reliance and causation discussed above are still applicable. Defendant seems to argue that the inference of reliance cannot apply to consumer actions at the damages phase, instead applying only in securities cases where markets are "efficient." (*See* Def. Opp'n Mem. at 14 n.14) (referencing the conclusion in *Randolph*, 303 F.R.D. at 696, that the "determination of whether the conduct is deceptive is not susceptible to a uniform presumption" but ignoring the fact that such a conclusion followed from the plaintiff's failure to demonstrate the deception at issue "would deceive an objectively reasonable consumer"). Defendant also fails to consider a potential class member's lack of alternatives to purchasing the product at the inflated price and the resulting harm of such a purchase.

Yet, it is precisely because of the inherent harm in purchasing a product at an inflated price that the consumer protection statutes here provide for an inference of reliance when the misleading act is material, or when it can be assumed that the price premium is related to the deceptive conduct. *Cf. Amgen*, 133 S. Ct. at 1192 (in the fraud-on-the-market context, it is "reasonable to presume that a particular . . . material misrepresentation will be reflected in

---

[17] At this stage, Dr. Dubé's proposal is sufficient. *See ConAgra II*, 90 F. Supp. 3d at 1026 ("other district courts have concluded that translating a partworth, i.e., the 'relative importance' of a particular attribute, into a price premium satisfies *Comcast*.") (citing *Guido v. L'Oreal, USA, Inc.*, No. 11 Civ. 1067 (CAS), 2014 WL 6603730, at *12-13 (C.D. Cal. July 24, 2014), and *Khoday v. Symantec Corp.*, No. 11 Civ. 180 (JRT) (TNL), 2014 WL 1281600, at *32-33 (D. Minn. Mar. 13, 2014)).

the . . . price").  Arguments as to the efficiency of the consumer goods market misunderstand the reasoning behind providing a presumption of reliance in the securities context.  The "fraud-on-the-market theory" is premised on the concept that when a security is traded in an efficient after-market, the market will absorb material misstatements and reflect them in the pricing of the security—a price no longer set by the issuing company making the misstatements.  *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988).  Here, the efficiency of the market is irrelevant because there is no difficulty connecting the alleged misstatements to the price of the good.  Allegedly, the producer of the goods engaged in deceptive marketing practices and set the price of the products accordingly.  Thus, if the deception was material, then the statutes in this case provide for reliance on those statements to be presumed.

Similarly, the difference between harm in the two contexts, securities transactions versus consumer goods purchases, is appreciable.  "[A]s a matter of pure logic, at the moment [a securities] transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Not so with the purchase of a consumer good that does not live up to what it was represented to be: in that case, the harm is immediate because the purchaser has ostensibly overpaid for a mislabeled product.  *See also Ebin*, 297 F.R.D. at 568–69 ("even if a class member actively wanted to buy pomace instead of 100% pure olive oil, they nevertheless paid too much for it" when they bought the deceptively labeled product).

The inference or presumption here may also be rebuttable, but that is a consideration for later in the proceedings, when a model is actually constructed and proof as to the materiality of the Active Naturals marketing is considered.[18]

_____

[18] Incidentally, that model may disaggregate the premium associated with the "Active Naturals" advertising scheme as compared to the Aveeno brand in general such that the only potential remaining question is binary:

\*    \*    \*

Defendant's *Daubert* motion is therefore DENIED, as Dr. Dubé's methodology is sufficiently explained in the report to demonstrate that it is designed to go further than is necessary in this case (as it considers both supply and demand changes accompanied by the removal of the Active Naturals branding), meaning the Court need only rely on the report, and find it reliable, for the limited proposition that a price premium attributable to the products can eventually be determined. The Court finds the report sufficiently reliable to inform it of that potential. The planned model does not impermissibly include other potential damages outside of the price premium such as other forms of fraud or price fixing. *See Comcast*, 133 S. Ct. at 1434 (plaintiffs proposed four theories of antitrust impact, the district court accepted one theory, but the model impermissibly calculated damages based on "the alleged anticompetitive conduct as a whole" rather than the theory selected by the court). Nor does it conflate damages with other non-liability based costs, given the presumption of reliance provided under the various statutes. Thus, the Court also finds the report sufficiently reliable to inform the Court of the damages it plans to assess. *See, e.g.*, *In re Scotts*, 304 F.R.D. at 414 ("the Court declines to hold an expert, at the class certification stage, must describe his proposed methodologies in the level of detail required by [*In re ConAgra Foods, Inc. ("ConAgra I")*, 302 F.R.D. 537, 551-53 (C.D. Cal. 2014)]");[19] *see also id.* at 412 n.8 (considering the expert proposal in light of *Comcast* rather than performing a full *Daubert* analysis).

Therefore, despite Defendant's assertion that this case is entirely unsuitable for class treatment (*see* Def. Opp'n Mem. at 1 (arguing certification would result in eviscerating Rule

whether or not a consumer purchased the product based on a potentially deceptive meaning. If a claimant at the damages stage indicated "yes," then the premium would be recoverable; if not, then the claim would be rejected.

[19] Defendant's criticisms of what the proposal does not yet do, which relate to data selection and exact variable determinations, are thus unavailing at this juncture. (*See* Def. *Daubert* Mem. at 16-22.)

23(b)(3) safeguards), the reality is that this is at most a case consolidating 15 different product-based actions and considering whether the Active Naturals packaging and branding surrounding those products is deceptive under the applicable state law schemes. *See, e.g.*, *Ebin*, 297 F.R.D. at 570 (certifying New York GBL Rule 23(b)(3) classes); *In re Scotts*, 304 F.R.D. at 416 (certifying New York and California UCL, FAL, and CLRA Rule 23(b)(3) classes); *Guido v. L'Oreal, USA, Inc.*, No. 11 Civ. 1067 (CAS), 2014 WL 6603730, at *18 (C.D. Cal. July 24, 2014) (rejecting decertification of New York class and certifying California Rule 23(b)(3) class); *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 524 (6th Cir. 2015) (affirming certification of California and Florida FDUTPA Rule 23(b)(3) classes); *Fitzpatrick*, 635 F.3d at 1283 (approving FDUTPA certification but remanding to correct class definition that required individual reliance); *Makaeff v. Trump Univ., LLC*, No. 10 Civ. 0940 (GPC) (WVG), 2014 WL 688164, at *14 (S.D. Cal. Feb. 21, 2014) (certifying New York, California, and Florida Rule 23(b)(3) classes).

With the number of products at issue significantly narrowed on the basis of class standing, three additional products removed due to changes in their packaging over time, and the advertising claims removed from the classes based on similar concerns of selective exposure, the Court finds that common questions predominate as to Defendant's liability. Furthermore, the Court is conditionally satisfied that damages are measurable on a class-wide basis. Defendant can move to decertify the damages portion of the classes upon a showing that materiality cannot be proven or that Plaintiffs' damages model, once complete, fails to perform.

### ii. *Superiority*

To proceed under Rule 23(b)(3), common questions must not only predominate, but a class action must also be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The factors to be considered during this

analysis that "implicate the superiority inquiry" include: the class members' interests in joint rather than individual actions, the extent of litigation concerning the controversy already begun by class members, the desirability of the class forum, and any difficulties in managing the class action. *Sykes*, 780 F.3d at 82; Fed. R. Civ. P. 23(b)(3)(A-D).

Defendant's critiques to the superiority of a class action, (*see* Def. Opp'n Mem. at 29 (the number of products at issue, problems with ascertainability of the class, and "substantive proof problems")), have largely been addressed above. *See also infra* Section I.c.i (ascertainability). Consumer class actions of this variety, designed to recover relatively small price premiums in comparison to the expense and burden of litigation, are clearly superior to the alternative of forcing consumers to litigate on principle. *See Amgen*, 133 S. Ct. at 1202 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.") (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997)).

These considerations weigh in favor of finding that class members' interests would best be served by a joint action. And, now that the action is significantly narrowed, managing the class would not be overly vexing on the Court. This Court is not aware of any other litigation concerning this particular controversy,[20] and can find no reason why this forum is less desirable than any alternative. *See Langan v. Johnson & Johnson Consumer Companies, Inc.*, 95 F. Supp. 3d 284, 287 (D. Conn. 2015) (action concerning sunscreen labels that state the product "provide[s] 'natural protection' and contain[s] '100% naturally-sourced sunscreen ingredients'"); *Lombardo v. Johnson & Johnson Consumer Companies, Inc.*, 124 F. Supp. 3d 1283, 1285 (S.D. Fla. 2015) (action concerning allegedly deceptive marketing regarding purported "benefit from

---

[20] This matter was briefly consolidated with a related action that was voluntarily dismissed with prejudice on July 28, 2015. (No. 14 Civ. 7506, ECF No. 44.)

switching from SPF 55 to SPF 85"); *Contreras v. Johnson & Johnson Consumer Companies, Inc.*, No. 12 Civ. 7099 (GW) (SHX), 2012 WL 12096581, at *1 (C.D. Cal. Nov. 29, 2012) (similar sunscreen allegations).

Therefore, a class action is the superior method of resolving this case.

### b. Rule 23(b)(2) Requirements

Plaintiffs also request injunctive relief prohibiting Defendant from continuing the unlawful practice of making deceptive "Active Naturals" representations. (Pls. Mem. at 13-14.) Because the damages classes have met the certification requirements under Rule 23(b)(3), the Court can "certify[y] [a] separate Rule 23(b)(2) . . . class[] addressing equitable relief[.]" *Sykes*, 285 F.R.D. at 293. The Named Plaintiffs have all, however, indicated that they are unable to purchase the products at this time: "purchas[ing] the Products in the future" requires confidence that the label is "truthful and non-misleading," and at the present time they do not have that confidence. (SAC ¶¶ 20, 24, 28; *see* Def. Opp'n Mem. at 29-30.) Defendant argues that Plaintiffs' hesitancy in purchasing the products again means they do not have standing to seek injunctive relief. (Def. Opp'n Mem. at 29); *see also ConAgra II*, 90 F. Supp. 3d at 980 ("allegations they 'might' or 'will' *consider* purchasing" the products were insufficient).

For largely the same reasons set forth in *Belfiore*, this Court finds certification of an injunctive class appropriate. *See Belfiore*, 311 F.R.D. at 67-68. An injunction prohibiting Defendant from engaging in the allegedly deceptive Active Naturals marketing would provide a single solution, applicable to each class member. *Sykes*, 780 F.3d at 80. The proposed injunctive class is cohesive, as demonstrated by this Court's finding of predominance under Rule 23(b)(3). *See Laumann v. Nat'l Hockey League*, 105 F. Supp. 3d 384, 395 (S.D.N.Y. May 14, 2015). Certification of an injunctive class is also necessary because "an injunction, unlike

monetary damages, will protect the rights of all consumers." *Belfiore*, 311 F.R.D. at 68.

Moreover, if magic words are required, then the fact that each Plaintiff "would continue to

purchase the Products in the future" if the misleading labeling is corrected, (SAC ¶¶ 20, 24, 28),

is sufficient to demonstrate an intent to purchase products in the future that subjects them to

future harm. *ConAgra II*, 90 F. Supp. 3d at 979 ("while '[c]ourts have rejected the argument that

a plaintiff cannot establish standing if he has learned that a label is misleading and therefore will

not be fooled by it again,' they 'do require [that] plaintiffs . . . express an intent to purchase the

products in the future'"); *see also Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418, 434

(S.D.N.Y. 2009) (noting that New York places a "high value on this type of injunctive relief").

### c. Rule 23(a) Prerequisites

#### i. *Numerosity—Rule 23(a)(1)—and Implied Requirement of Ascertainability*

Under Rule 23(a)(1), numerosity is presumed where a putative class has 40 or more

members. *Shahriar*, 659 F.3d at 252. Plaintiff asserts—and Defendant does not dispute—that

millions of dollars of sales occurred in New York, California, and Florida. (Pls. Mem. at 8

(Defendant's "records show sales of the Products in the hundreds of millions of dollars in New

York, California and Florida"); Garber Decl., Ex. 14 (sales data).) Courts may find numerosity

of a proposed class on the basis of undisputed representations, or based on objectively high sales

figures. *Shahriar*, 659 F.3d at 252; *see, e.g.*, *Belfiore*, 311 F.R.D. at 61 ("numerosity is obvious"

where millions of units were sold in New York). If, at any time, it appears that less than forty

consumers in a particular state purchased any of the products remaining in the respective classes,

then Defendant can seek to exclude those products from the class definition. Therefore,

numerosity is satisfied for the classes.

As for the ascertainability of the class, "[a]n identifiable class exists if its members can be ascertained by reference to objective criteria." *MTBE Prods.*, 209 F.R.D. at 336. Courts in this Circuit have disagreed on whether ascertainability is possible in low-cost, consumer class actions due to the unlikelihood that a class member would retain some form of proof of purchase. *Compare Weiner v. Snapple Beverage Corp.*, No. 07 Civ. 8742 (DLC), 2010 WL 3119452, at *13 (S.D.N.Y. Aug. 5, 2010) ("there is no evidence to suggest that [Snapple's] consumers treat it like a fine wine and remove and save its labels"), *with Ebin*, 297 F.R.D. at 567 ("the possibility that class members will have discarded [receipts or] the product [does not] render the class unascertainable"). Similarly in this case, because there is no central repository linking sales to customers, *i.e.* providing the best objective criteria to reference, ascertaining the membership of the classes will require the somewhat criticized method of self-reporting. *See Carrera v. Bayer Corp.*, 727 F.3d 300, 308 (3d Cir. 2013) (disfavoring the use of affidavits to satisfy the ascertainability requirement).

This Court, however, joins other courts in this Circuit that have adopted the reasoning of Judge Rakoff, set forth in *Ebin*, that denial of class certification in consumer protection cases like these on the basis of ascertainability would severely contract the class action mechanism as a means for injured consumers to seek redress under statutes specifically designed to protect their interests. *Ebin*, 297 F.R.D. at 567 (class actions are "designed for cases like this where a large number of consumers have been defrauded but no one consumer has suffered an injury sufficiently large as to justify bringing an individual lawsuit"); *id.* ("ascertainability difficulties, while formidable, should not be made into a device for defeating the action"); *accord Belfiore*, 311 F.R.D. at 66-67; *In re Scotts*, 304 F.R.D. at 407; *see also Byrd v. Aaron's Inc.*, 784 F.3d 154,

177 (3d Cir. 2015) (Rendell, C.J., concurring) (quoting *Ebin* and noting that a "heightened ascertainability jurisprudence" may as a consequence "keep[] damages from the truly injured").

Defendant reiterates all of the potential difficulties in self-identification if this case were to proceed, as originally formulated, with 90 products at issue—some of which had labels that changed during the class period. (Def. Opp'n Mem. at 27-28.) But the narrowing of the action resulting from the preceding predominance analysis eliminates these concerns. Defendant does correctly point out, though, that Plaintiffs have not attempted to provide "a method to demonstrate to the Court that identification of class members is administratively feasible[.]" (Def. Opp'n Mem. at 28.) Plaintiffs' objective criteria, so enumerated, is simply: "An individual has either purchased a [p]roduct or has not." (Pls. Reply at 12.) While plainly unhelpful, this Circuit only requires "objective criteria" coupled with "definite boundaries" to find a class "readily identifiable." *Brecher v. Republic of Argentina*, 806 F.3d 22, 26 (2d Cir. 2015) (class not ascertainable where it would be "nearly impossible to distinguish between [holders of beneficial interests in bonds] once [the bonds] traded on the secondary market without a criterion as to time held"). The proposed classes of consumers are temporally limited, as required.

Thus, the Court concludes that the implied ascertainability requirement of Rule 23 can, at minimum, be met on the basis of sworn statements indicating class members purchased the products at issue in the necessary state during the necessary limitations period.

### ii. *Commonality—Rule 23(a)(2)*

"Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349-50 (citing *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982)). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a class[-]wide proceeding to

generate common answers apt to drive the resolution of the litigation." *Id.*; *see also Jacob v. Duane Reade, Inc.*, 602 F. App'x 3, 6 (2d Cir. 2015).

Plaintiffs originally formulated the common question in this matter, relevant to the claims surviving the predominance analysis, as: "Whether Defendant's labeling, marketing, advertising, and/or selling of the Products with the representation 'Active Naturals' as described herein constitutes a deceptive consumer sales practice."  (SAC ¶ 56(e).)  In their motion for class certification, they more simply describe it as "whether it is deceptive to label the Products with the very registered trademark by which the Products are known and prominently labeled— 'Active Naturals.'"  (Pls. Mem. at 14.)  Defendant suggests that because Plaintiffs identified only this singular common question, the motion for class certification should be denied on that ground alone.  (Def. Opp'n Mem. at 13.)  But "for purposes of Rule 23(a)(2) even a single common question will do."  *Dukes*, 564 U.S. at 359 (internal quotations and modification omitted).

In order to satisfy the more exacting, but related, predominance requirement and conducting the necessary "rigorous" analysis of Plaintiffs' claims, the Court has already formulated common questions resolvable "through generalized proof" relating to each product and demonstrated they were "more substantial than the issues subject only to individualized proof."  *In re Visa Check*, 280 F.3d at 136; *see, e.g.*, *Belfiore*, 311 F.R.D. at 69 (common questions surrounding whether something was "flushable"); *see In re Scotts*, 304 F.R.D. at 409 ("[T]he Supreme Court has held materiality 'is a question common to all members of the class' when, as here, the materiality of an alleged misrepresentation is judged according to an objective standard.") (citing *Amgen*, 133 S. Ct. at 1191).

Those questions include:

(1) When the "Active Naturals®" representation is combined with a particular product's packaging and labeling, what does the marketing combination mean to a reasonable consumer?

(2) For any particular Active Naturals product, is Defendant's marketing combination materially misleading?

(3) Did class members pay a price premium as a result of the combined representation?

(4) Was that premium—to the extent that it can be reasonably ascertained—relatively uniform?

And, as noted above during the predominance analysis, there may be certain factual distinctions between individual class members—namely actual non-reliance on the misleading statement. For example, some consumers may have purchased the product because they liked the color of the bottle, without regard to the Active Naturals labeling, and will continue purchasing the product for that reason. These distinctions, however, relate to the individual damage calculations for members of the classes. *See Jacob*, 602 F. App'x at 7 (in the related but more stringent predominance inquiry, the requirement can be satisfied as to questions of liability irrespective of the individualized damages inquires). "[B]ecause commonality does not mean that all issues must be identical as to each member, the need for an individualized determination of damages suffered by each class member generally does not defeat the requirement." *Padilla v. Maersk Line, Ltd.*, 271 F.R.D. 444, 448 (S.D.N.Y. 2010) (internal quotation marks and citations omitted); *Butler*, 727 F.3d at 801 ("the fact that damages are not identical across all class members should not preclude class certification"). Defendant's criticisms on the bases of individual understandings of the Active Naturals brand, individual questions of causation, and potentially individualized damages have therefore already been addressed.

The common questions in this action that satisfied the predominance analysis necessarily satisfy the commonality requirement. Answers to the common questions undoubtedly will "drive the resolution of the litigation" with respect to all parties. *Dukes*, 564 U.S. at 349-50.

iii.     *Typicality—Rule 23(a)(3)*

Typicality "requires that the claims of the class representatives be typical of those of the class." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care. L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007) (internal quotation marks and citation omitted). This requirement is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff[s] and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993) (citations omitted). Put another way, the issues in the action must "occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *In re Scotts*, 304 F.R.D. at 405-06 (citation omitted).

Consumers of the same product, exposed to the same marketing and packaging, will have almost entirely the same claims with at most "minor variations" in the facts surrounding their purchase of the products. *See Ebin*, 297 F.R.D. at 566-67 (plaintiff purchasers of mislabeled olive oil products were typical of other potential class members despite any differences relating to their individual purchasing decisions); *Johns v. Bayer Corp.*, 280 F.R.D. 551, 557 (S.D. Cal. 2012) (typicality met where plaintiffs and the proposed class had the same claims arising out of the defendant's marketing campaign for men's vitamins).

38

It is unfortunate that neither side acknowledges the ambiguity present in the trademark at issue. Plaintiffs suggest that "Active Naturals" equates to "100% natural," even though that is indisputably not what the Named Plaintiffs believed and ignores the modifying word "active." (*See* Pls. Mem. at 16 (the issue of deception is "a binary issue"—whether "labeling the Products as 'Active Naturals' despite the *presence* of synthetic ingredients is deceptive") (emphasis added).) Defendants disingenuously posit that the label is clear *as a matter of law*, because it unequivocally indicates there is a very small set of natural ingredients or "naturals" that are "active," while the rest of the ingredients are not necessarily natural. (*See* Def. Opp'n Mem. at 2 ("select efficacious natural ingredients").) As is so often the case, the truth is somewhere in between, and the meaning of the trademark—colored by the packaging and advertisements attached to the products—is a matter to be determined as the factual record is developed on Plaintiffs' merits case.

Plaintiff Goldemberg's understanding of the product fits within the relative bounds of a potentially deceptive meaning under New York law. As Defendant indicates, "Goldemberg knew when he bought them that the Products contained *some* synthetic ingredients," thinking "the Products were made 'predomina[nt]ly,' but not entirely, from natural ingredients." (Def. Opp'n Mem. at 5 (emphasis added).) That understanding is clearly not accurate based on Johnson & Johnson's view of what the brand should imply.

Plaintiff Le's understanding of the product actually closely resembles this Court's perspective on the claims: "she testified that she 'couldn't compare one [product] to another' because they are 'all different products' containing different ingredients" and did "not understand 'Active Naturals' to have a common meaning across the Products." (*Id*. at 7.) What she understood about the products she had purchased, however, lies squarely on the deceptive

side of the scale.  Le understood "that the Products were all natural, [and] offered several definitions of that word, including 'dye-free,' 'not heavily processed,' and not 'synthesized.'" (*Id.*)  That understanding is also clearly not accurate.

Plaintiff Petlack's understanding of the product also fits within this framework—he "believed they [generally] contained 'all natural' ingredients, [and] believe[d] that one was 'mostly natural and did not have a lot of synthetic ingredients in it.'"  (*Id.* at 6.)

Having disposed of the claims relating to products that the Named Plaintiffs did not purchase, and having discussed the nature of the generalized proof necessary to find the marketing of the products still at issue objectively deceptive, the Named Plaintiffs are not "subject to any unique defenses which threaten to become the focus of the litigation."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009) (internal quotation omitted).[21]

Thus, the typicality requirement is satisfied by the record before this Court.

### iv.  Adequacy—Rule 23(a)(4)

In order to justify a departure from "the usual rule that litigation is conducted by and on behalf of the individual named parties only," *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979), "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (internal quotation and citation omitted).  As such, Rule 23(a)(4) requires that class representatives "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Where the "class representatives are prepared to prosecute fully the action and have no known conflicts with any class member," the adequacy requirements are met.  *Shahriar*, 659

---

[21] Defendant's arguments regarding Goldemberg's reliance on the allegedly deceptive conduct and the staleness of Le's claims have already been disposed of above.  Furthermore, in light of the presumption of reliance, the application of laches to Petlack's claims purely on the basis of his potentially heightened concerns regarding product ingredients is unconvincing.  (*See* Def. Opp'n Mem. at 25-26.)

F.3d at 253; *Sykes*, 780 F.3d at 90 (the class representatives interests should not be "antagonistic to the interest of other members of the class").

The Named Plaintiffs were each misled by the Active Naturals advertising strategy and purchased the Aveeno products as a result. (Garber Decl., Ex. 15 (Decl. of Michael Goldemberg ("Goldemberg Decl.")) at ¶¶ 4, 6-9, Ex. 16 (Decl. of Annie Le ("Le Decl.")) at ¶¶ 4, 6-9, Ex. 17 (Decl. of Howard Petlack ("Petlack Decl.")) at ¶¶ 4, 6-9.) They have also each sat for lengthy depositions and provided testimony in the matter, and are prepared to litigate the case to its conclusion. (Goldemberg Decl. ¶¶ 5, 10-12; Le Decl. ¶¶ 5, 10-12; Petlack Decl. ¶¶ 5, 10-12.)

Defendant suggests that the Named Plaintiffs will not fairly and adequately protect the interests of their respective classes, because they are operating under a conflict of interest. (Def. Mem. at 26.) In support of that assertion, Defendant highlights the deposition testimony of the Named Plaintiffs that demonstrates each is a long-time friend or acquaintance of class counsel, and that Le and Petlack heard about the case through co-counsel Kim Richman. (*Id.* at 5-8.) Defendant conveniently ignores that Goldemberg also testified that *he* initiated the conversation about the potentially deceptive conduct at issue in this case. (*See* Goldemberg Tr. at 21 ("I had mentioned I had been using these Aveeno 'Active Natural' products and that, you know, maybe they're not so natural").)

With that in mind, the Court perceives no overwhelming concern associated with the method by which Le and Petlack were informed of and added to the litigation. *Cf. Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization*, LLC, 616 F. Supp. 2d 461, 464 (S.D.N.Y. 2009) (in the securities context, a free monitoring agreement provided a "clear incentive" for "lawyer-driven litigation"). Nor does their direct or one-degree removed friendship with either of co-class counsel indicate *per se* that they cannot "exercise independent

judgment in those situations, such as settlement negotiations, in which the interests of the class and counsel may diverge." *Cf. Gordon v. Sonar Capital Mgmt. LLC*, 92 F. Supp. 3d 193, 199-200 (S.D.N.Y. 2015) ("murky role" of named plaintiff's lawyer-friend in the litigation, including an undisclosed fee sharing agreement with class counsel that could materially exceed the named plaintiff's potential recovery, created "the appearance of impropriety" but did "not necessarily suffice to render [the plaintiff] an inadequate class representative"); *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 309 (S.D.N.Y. 2004) (a speculative conflict based on the fact that a named plaintiff is a "close personal friend of his attorney" carries little weight at the class certification stage).

Between the allegations in the Second Amended Complaint and the record before the Court, sufficient evidence is present to determine that the Named Plaintiffs are fully prepared to act as class representatives and prosecute the case, and have no inherent conflict with any class members. *See In re Scotts*, 304 F.R.D. at 406-07 ("Lead plaintiffs have each demonstrated their commitment to pursuing these claims by . . . sitting for lengthy depositions [and] . . . testified he or she understands the requirements of serving as lead plaintiff"). *See also Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 158 (S.D.N.Y. 2008) ("The fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiffs' claims will vindicate those of the class."). The adequacy requirement is, therefore, met.

*      *      *

Finally, given sufficient allegations and testimony by the Named Plaintiffs concerning their repeated purchases within the applicable limitation periods and prior to the initiation of this action, the Court will, for the purposes of deciding the instant motion, define the class period as

commencing with the relevant Named Plaintiff's first potential purchase within the limitations period and continuing until the present.

Because the Rule 23(a) requirements have been met, along with the requirements under and Rules 23(b)(2) and (b)(3), class certification of the New York Class, the California Class, and the Florida Class is GRANTED as modified, with each class broken into subclasses based on the applicable products pursuant to Rule 23(c)(5). The classes are granted under Rule 23(b)(3) with regard to the price premium damages Plaintiffs seek and under Rule 23(b)(2) with regard to the injunctive relief sought—namely a prohibition on Defendant marketing products as "Active Naturals®." The claims applicable to the New York Class include Count I of the Second Amended Complaint, the claims applicable to the California Class include Counts IV, V & VI, and the claims applicable to the Florida Class include Count VIII. Allegations concerning Johnson & Johnson's website or Facebook advertising are not included in these class definitions. The potential defense that the label and packaging for any given product is objectively non-misleading, or immaterial to a reasonable consumer, applies throughout.

## II.    Appointment of Class Counsel

Plaintiffs request in their motion for class certification (Pls. Mem. at 4) that counsel for the Named Plaintiffs be appointed as class counsel in the event this Court certified the classes. "Class counsel must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4). No other law firms are currently seeking appointment. Plaintiffs' counsel, Finkelstein, Blankinship, Frei-Pearson & Garber, LLP and The Richmond Law Group, have already identified and begun the investigation of potential claims in this action, including conducting preliminary depositions in order to develop the factual record in support of class certification. Plaintiffs' counsel is qualified and experienced in class action law and specifically consumer

class actions focusing on allegedly deceptive labeling in the natural products market.  (*See* Garber Decl., Ex. 19; Decl. of Kim Richman in Supp. of Mot. Class Cert. ("Kim Decl.") ¶¶ 5-8, Ex. 1.)  Defendants do not challenge these assertions.  Counsel has not specifically indicated whether it will commit the necessary resources to represent the classes, but at this time that does not weigh against their appointment as class counsel.  *See Kimber v. Tallon*, 556 F. App'x 27, 28 (2d Cir. 2014) (certifying court should weigh the "significant considerations" of class counsel's "lack of resources and its inexperience in federal class actions").

Thus, the Court finds that at this time Finkelstein, Blankinship, Frei-Pearson & Garber, LLP and The Richmond Law Group satisfy Rule 23(g)'s requirements and APPOINT each firm to serve as co-class counsel.

## III.    Notice to the Classes

Notice to potential members of the Rule 23(b)(3) classes must be the "best notice that is practicable" in these circumstances.  Fed. R. Civ. P. 23(c)(2)(B).  Per the requirements of Rule 23(c)(2)(B), such notice must "clearly and concisely," in straightforward language, state (1) the nature of the action; (2) the class definition; (3) the class claims, issues, or defenses; (4) the ability of a class member to enter an appearance in the class action through an attorney; (5) the ability to opt-out of the class; (6) the time and manner restrictions on doing so; and (7) the binding nature of a class judgment on all individuals the Court finds to be members of the class, who did not request to be excluded.  The class definition should indicate when the class period begins and ends.

The Court, therefore, DIRECTS Plaintiffs, after conferring with Defendant, to provide the Court with a joint proposed notice of the action to all class members, along with the method of providing such notice to all members, including those identifiable through reasonable effort.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for class certification and appointment of class counsel is GRANTED as modified, Defendant's *Daubert* motion is DENIED, and this Court ORDERS:

1.  The New York Class of consumers that purchased any of the following products during the limitations period is hereby certified under Rule 23(b)(3) and separately under Rule 23(b)(2) with regard to injunctive relief, with subclasses based on the Aveeno Active Naturals product at issue:

    a.  Creamy Moisturizing Oil (12 fl. oz.),

    b.  Therapeutic Shave Gel (7 fl. oz.),

    c.  Positively Smooth Shave Gel (7 fl. oz.),

    d.  Positively Nourishing Comforting Whipped Souffle (6 oz.),

    e.  Nourish+ Moisturize Shampoo (10.5 fl. oz.), or

    f.  Nourish+ Moisturize Conditioner (10.5 fl. oz.).

2.  Named Plaintiff Michael Goldemberg is appointed as class representative for the New York Classes and Subclasses.

3.  The California Class of consumers that purchased any of the following products during the limitations period is hereby certified under Rule 23(b)(3) and separately under Rule 23(b)(2) with regard to injunctive relief, with subclasses based on the Aveeno Active Naturals product at issue:

    a.  Moisturizing Lotion with Broad Spectrum SPF 15 (12 fl. oz.),

    b.  Skin Relief 24hr Moisturizing Lotion (12 fl. oz.),

    c.  Positively Nourishing Energizing Body Lotion (7 oz.),

     d.   Positively Ageless Firming Body Lotion (8 oz.),

     e.   Positively Radiant Makeup Removing Wipes (25 count),

     f.   Positively Ageless Youth Perfecting Moisturizer Broad Spectrum SPF 30 (2.5 fl. oz.),

     g.   Positively Ageless Lifting & Firming Eye Cream (0.5 oz.), or

     h.   Positively Radiant Daily Moisturizer Broad Spectrum SPF 15 (4 fl. oz.).

4.  Named Plaintiff Annie Le is appointed as class representative for the California Classes and Subclasses.

5.  The Florida Class of consumers that purchased any of the following products during the limitations period is hereby certified under Rule 23(b)(3) and separately under Rule 23(b)(2) with regard to injunctive relief, with subclasses based on the Aveeno Active Naturals product at issue:

     a.   Therapeutic Shave Gel (7 oz.), or

     b.   Moisturizing Bar (3.5 oz.).

6.  Named Plaintiff Howard Petlack is appointed as class representative for the Florida Classes and Subclasses.

7.  Finkelstein, Blankinship, Frei-Pearson & Garber, LLP and The Richmond Law Group are appointed as co-class counsel; and,

8.  On or before November 5, 2016, Plaintiffs shall, after conferring with Defendant, provide the Court with a joint proposed notice designed to achieve the best practicable notice to identifiable class members and explain the methodology that will be employed to determine such class members.

The parties are directed to contact Magistrate Judge Lisa M. Smith within 48 hours of the issuance of this opinion and, after consultation before Judge Smith, to write this Court regarding the status of pending discovery issues. The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 69 and 80.

Dated:    October 4th, 2016                SO ORDERED:
          White Plains, New York

                                        NELSON S. ROMÁN
                                  United States District Judge